**UNITED STATES of America, Appellee,**

**v.**

**Russell BUFALINO, Michael Sparber, and Herbert Jacobs, Defendants-Appellants.**

**Nos. 636, 637, 663, Dockets 77–1438, 77–1444, and 77–1445.**

United States Court of Appeals, Second Circuit.

Argued Feb. 9, 1978.
Decided May 10, 1978.

---

Barbara S. Jones, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for S. D. New York, Audrey Strauss, Asst. U. S. Atty., New York City, of counsel), for appellee.

Charles P. Gelso, Wilkes-Barre, Pa. (Wilfred L. Davis, New York City, of counsel), for defendant-appellant Bufalino.

William J. Gilbreth, New York City (James F. Haley, Jr., New York City, of counsel), for defendant-appellant Sparber.

Arnold E. Wallach, New York City, for defendant-appellant Jacobs.

Before HAYS, FEINBERG and MANSFIELD, Circuit Judges.

FEINBERG, Circuit Judge:

Russell Bufalino, Michael Sparber and Herbert Jacobs appeal from their convictions for using extortionate means to collect extensions of credit and conspiracy to commit that crime in violation of 18 U.S.C. § 894, following a jury trial before Judge Lasker of the United States District Court for the Southern District of New York.[1] Appellants raise numerous points, principally that the judge should have granted their motions to suppress certain tape recordings and testimony, that a mistrial should have been declared because of third-party contact with the jury, and that appellants were not shown to have engaged in conduct prohibited by 18 U.S.C. § 894. We conclude that the judgments of conviction should be affirmed.

## I. *The Facts*

The jury could have found as follows. In mid-February 1976, a singularly credulous New York jeweler named Herbert Jacobs entered into a number of transactions with one Jack Napoli wherein some $25,000 worth of diamonds were transferred to Napoli in exchange for a series of promises and a worthless check. Some of Napoli's success derived from repeated unauthorized invocations of the name of Russell Bufalino, who evidently constituted an impressive credit reference with Jacobs. When Napoli's vows of restitution went unmet, Jacobs called in Bufalino and Michael Sparber for help in collecting the moneys owed. There followed a series of threats by these two men, inducing Napoli to contact the FBI. Sparber at one point told Napoli's girl friend that she and her children would be jeopardized "[i]f Jack doesn't do the right thing." The FBI outfitted Napoli with devices which recorded and transmitted various telephone and face-to-face conversations between Napoli and appellants. During the surveillance period, Sparber and Bufalino warned Napoli that he would be subjected to bodily harm if he failed to honor his debts. Bufalino was recorded on one of the tapes as cursing Napoli and threatening that "I'm going to kill you." Jacobs told Napoli over the telephone that if he "showed . . . good faith, they're not gonna kill you." A review of these and related aspects of the record convinces us that the jury's verdict rested on an ample evidentiary foundation. It remains to consider appellants' divers assignments of error.

## II. *The Suppression Motion*

Appellants argue that tapes of face-to-face conversations with Napoli and related testimony should have been suppressed, because an FBI agent destroyed certain additional tapes of the conversations. The recordings admitted in evidence were made by a so-called "Nagra" device on Napoli's person. The destroyed tapes came from a back-up recorder, which was part of a radio receiver surveillance unit monitoring transmissions from another device (a Kel transmitter) carried by Napoli.

Judge Lasker held a pretrial hearing upon appellants' motion to suppress evidence. An FBI agent testified that the principal reason for the Kel transmitter was to protect Napoli, and that, in reliance upon what he conceived to be standard Bureau policy, he had disposed of the Kel backup tapes about a week after they were made, upon determining that they were decidedly inferior to the Nagras. Condemning this ad hoc decision in strong terms, Judge Lasker nonetheless denied the motions to suppress in a memorandum opinion.

1. Jacobs was placed on probation for three years and fined $2,500. Sparber received one year in prison on the conspiracy count, to be followed by five years probation on the substantive count. Bufalino was sentenced to four years imprisonment on the conspiracy count, to be followed by five years probation on the substantive count, with $10,000 fines imposed on both counts.

■ We do not understand the Government to deny that the destroyed materials constituted statements discoverable before trial under Fed.R.Crim.P. 16, and during trial under the provisions of the Jencks Act, 18 U.S.C. § 3500. We held in *United States v. Crisona,* 416 F.2d 107, 114–15 (2d Cir. 1969), cert. denied, 397 U.S. 961, 90 S.Ct. 991, 25 L.Ed.2d 253 (1970), that tapes of statements made by a defendant in the process of committing a crime were within the scope of Rule 16; we suggested but did not decide that such tapes might also constitute Jencks Act material if they included statements by a government witness and were recorded at the government's instigation. *Id.* at 113. That precise situation subsequently confronted us in *United States v. Miranda,* 526 F.2d 1319, 1327 (2d Cir. 1975), cert. denied, 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976), and we stated that both Rule 16 and the Jencks Act entitled the defense to examine the taped material. See also *United States v. Birnbaum,* 337 F.2d 490, 497 (2d Cir. 1964). We adhere to that conclusion under the indistinguishable circumstances of the present case.

■ As Judge Lasker recognized, the Nagra tapes introduced in evidence contained gaps and inaudible passages upon which the back-up recordings, whatever their overall quality, might possibly have shed some light. This case thus falls into a regrettably sizeable class of prosecutions in which the defense might have been hampered by the Government's failure to live up to strict statutory obligations with respect to preservation of evidence. A review of the precedents reveals a distressing number of shredded, discarded, abandoned, and "intentionally non-preserved" documents, with those responsible for the most part—as here—professing no intention to suppress material evidence.[2] While we have decided that the special circumstances of the instant case militate against reversal on this ground, we will look with an exceedingly jaundiced eye upon future efforts to justify non-production of a Rule 16 or Jencks Act "statement" by reference to "department policy" or "established practice" or anything of the like. There simply is no longer any excuse for official ignorance regarding the mandate of the law. Where, as here, destruction is deliberate, sanctions will normally follow,[3] irrespective of the perpetrator's motivation, unless the Government can bear the heavy burden of demonstrating that no prejudice resulted to the defendant. See *United States v. Carrasco,* supra, 537 F.2d at 376–79; *Krilich v. United States,* 502 F.2d 680, 685–86 (7th Cir. 1974), cert. denied, 420 U.S. 992, 95 S.Ct. 1429, 43 L.Ed.2d 673 (1975); cf. *Goldberg v. United States,* 425 U.S. 94, 111 n.21, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976) ("Since courts cannot 'speculate whether [Jencks material] could have been utilized effectively' at trial, . . . the harmless-error doctrine must be strictly applied in Jencks Act cases."). This rule is consonant with language in earlier opinions of this court adverting to the appropriateness of sanctions for intentional "loss or suppression of evidence," *United States v. Miranda,* supra, 526 F.2d at 1328, and calling for a new trial where deliberately suppressed Jencks Act material subsequently surfaces and proves to be "merely material or favorable to the defense." *United States v. Hilton,* 521 F.2d 164, 166 (2d Cir. 1975), cert. denied, 425 U.S. 939, 96 S.Ct. 1674, 48 L.Ed.2d 181 (1976). In educating personnel concerning their responsibilities in this area, government agencies must keep in mind the broad definition of discoverable "statements" incorporated in the governing

---

**2.** *See, e. g., United States v. Carrasco,* 537 F.2d 372 (9th Cir. 1976) (witness' handwritten diary, held to be a "statement," shredded by Drug Enforcement Administration agent pursuant to routine procedure); *United States v. Augello,* 451 F.2d 1167 (2d Cir. 1971), cert. denied, 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1972) (defendant's taped statements destroyed by the police, who found them unintelligible); *United States v. Bryant,* 142 U.S.App.D.C. 132, 439 F.2d 642 (1971) (Federal Bureau of Narcotics agent guilty of "intentional non-preservation," albeit not in bad faith, of taped statements by defendant); *United States v. Lonardo,* 350 F.2d 523 (6th Cir. 1965) (stenographic transcripts of interviews with witnesses destroyed in accordance with FBI procedures after "formal interview reports had been made out").

**3.** See *United States v. Miranda, supra,* 526 F.2d at 1324 n.4 (listing possible sanctions).

texts.[4] We emphatically second the district court's observation that any resulting costs in the form of added shelf space will be more than counterbalanced both by gains in the fairness of trials and also by the shielding of sound prosecutions from unnecessary obstacles to a conviction.

■ In the case at hand, however, we feel that it would be unwise and unjust to apply a strict prophylactic rule, given the mitigating factors expressly relied upon by the district court. Judge Lasker heard and credited testimony that the back-up recordings were "largely inaudible" and exceedingly inferior in quality to the Nagra tapes; since the Nagra tapes were of "relatively high quality," the possibility that the defense could usefully have supplemented their content by resort to the back-up recordings is minimal. Also, we agree with the district court that, given "the nature and content" of the tapes played to the jury, there is "no reason to believe" that any such supplementary material "would have been favorable to the defense."[5] Finally, the FBI took extensive precautions to guard the recordings ultimately received in evidence from tampering during and after their creation.[6] Under the circumstances, we hold that Judge Lasker did not err in denying the motion to suppress.

### III. Third-Party Contact With the Jury

At the opening of the third day of trial, the court and counsel were informed by a deputy clerk that

in framing their rules for evidence preservation investigative agencies must define discoverable evidence very broadly, including any materials that "might" be "favorable" to the accused.
*United States v. Bryant, supra,* 142 U.S.App. D.C. at 142, 439 F.2d at 652 n.21. *Cf. United States v. Anzalone,* 555 F.2d 317, 321 (2d Cir. 1977), cert. denied, 434 U.S. 855, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978) (recommending that FBI retain agents' handwritten notes of witness interviews).

4. Section (a)(1)(A) of Fed.R.Crim.P. 16 requires the government upon request to "permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government . . .." Section (a)(1)(C) opens to the defendant's perusal

books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of his defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

The Jencks Act, 18 U.S.C. § 3500, regulates disclosure of statements by government witnesses; after such witnesses have testified, the defense may obtain "any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." Id. § 3500(b). Section (e) of § 3500 defines "statement" as

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;
(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

Also relevant in this regard are the disclosure obligations stemming from *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); we agree with the District of Columbia Circuit that *Brady* envisions that

5. For example, no gaps, attributable to unintelligibility or other flaw, are noted in the transcript passage most damaging to Bufalino's defense:

RUSSELL B[UFALINO]: And if you gonna do it, don't do the right thing, I'm going to kill you [epithet omitted], and I'm going to do it myself and I'm gonna go to jail just for you.

6. FBI agent Edwards' testimony on this critical point was summarized by Judge Lasker as follows:

Edwards testified that in accordance with standard procedure he personally placed the Nagra device on Napoli's waist and activated it, and that, although the tape had run out, the machine was still in the "on" position when received by the F.B.I. at the conclusion of the conversations . . . . As a precaution against tampering, the on-off switch was taped in the "on" position and the entire machine was wrapped in evidence tape around the midsection. On its return to the F.B.I. there was no indication that either the machine or the tape had been tampered with in any way.

The jurors called me into their room and they said they are quite nervous . . . [E]very time they go in or out a couple of the spectators are glaring at them. They said no matter where they went they kept bumping into these people . . ..

After discussion of the problem with all the attorneys concerned, Judge Lasker decided to conduct a voir dire of the jurors individually in chambers, outside the presence of counsel.

█ We sanctioned this very procedure in *United States v. Miller,* 381 F.2d 529, 540 (2d Cir. 1967), cert. denied, 392 U.S. 927, 88 S.Ct. 2273, 20 L.Ed.2d 1387 (1968). Judge Lasker's decision to use it, in response to a request from Sparber's attorney, elicited no objection. Counsel for Jacobs was specifically asked if the voir dire would be acceptable to him, and he voiced no dissent. No timely suggestion was made, after all the parties had an opportunity to review the transcripts, that additional questioning with or without counsel present would be desirable.[7] Yet Bufalino now contends that the interviews denied him his right to be present at every stage of his trial, invoking Fed.R.Crim.P. 43. Given the factors reviewed above, we have no hesitation in rejecting, on waiver grounds, this tardily raised claim. It is fair to conclude that—here, as in *Miller*—counsel agreed not to be present when the juror interviews were conducted. To obviate such post hoc challenges altogether, district courts would do well in the future to elicit the express consent of all parties to any in-chambers juror interviews that may become necessary. *Cf. United States v. Taylor,* 562 F.2d 1345, 1365 (2d Cir.), cert. denied, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 and, 434 U.S. 854, 98 S.Ct. 170, 54 L.Ed.2d 124 (1977).

█ All three appellants also maintain that the Government failed to discharge its burden of establishing that the spectator "contacts" with the jurors did not affect the verdict. See *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954). But *Remmer* and its progeny apply only where the third-party contacts involve a "matter pending before the jury." See id. As we stated in *United States v. Brasco,* 516 F.2d 816, 819 (2d Cir.), cert. denied, 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975): "[w]here an unauthorized private communication, contact, or tampering with a juror during a trial does not relate to a matter pending before the jury, there is no right to a new trial absent a showing of prejudice by the defendant."

The *Brasco* standard governs this case. At issue here are laughs, stares, rebuffed efforts to start conversations and the entry of an unidentified female into the juror's bathroom following a plumbing breakdown elsewhere in the building. Any public trial can be expected occasionally to involve comparable incidents, and the district court's description of some of the perpetrators as "husky and menacing looking" does not of itself create a *Remmer* presumption of prejudicial contact.

In their interviews with Judge Lasker, all of the jurors who said they had seen or heard about spectator activity were asked if anything had happened that would affect their judgment. All responded with express denials except one, who said cryptically that "I am for law and peace," and denied that she was "in any fear about the situation." Were this in fact a *Remmer* situation involving contacts related to the trial, Judge Lasker's failure to pursue the matter might give us some pause. But here there was no presumption of prejudice, and we are mindful of the teaching that "[b]ecause of his continuous observation of the jury in court, a trial judge's handling of

---

7. After the judge's charge, counsel for appellant Sparber did ask permission to question the *alternate* jurors further about spectator contacts to ascertain whether "the jurors associate the spectators with one [or] more of the defendants and think that through the spectators the defendants may have tried to do something wrong." Judge Lasker rejoined, we think cor-

rectly, that any such concerns could and should have been voiced long before the jury had retired to consider its verdict. In a finding to which we must give deference, he reiterated that "the trier of fact believes, and everything is on the record, that no juror was intimidated or resentful . . .."

alleged juror misconduct or bias is only reviewable for abuse of discretion." *United States v. Panebianco,* 543 F.2d 447, 457 (2d Cir. 1976), cert. denied, 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977). On the record summarized above, the judge's refusal to order a mistrial following the voir dire was not an abuse of discretion.[8]

## IV. The Extension of Credit

■ Appellants juxtapose the record and the language of the statute under which they were convicted, 18 U.S.C. § 894, in an effort to demonstrate that they were not shown to have engaged in any criminal activities cognizable in a federal court. One element of the crime for which appellants were convicted is an "extension of credit," with which coercive means of inducing repayment are associated. We are told that Jacobs extended no credit to Napoli, because Napoli got the jewels through deceit and never had any intention of paying· for them. Accepting this, it does not follow that appellants' threats fell outside the ambit of 18 U.S.C. § 894. Congress took an exceedingly broad view of what it is "to extend credit," incorporating "any agreement, tacit or express, whereby the repayment or satisfaction of *any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising,* may or will be deferred." (Emphasis supplied). 18 U.S.C. § 891(1). Napoli's diamond swindle certainly gave rise to a claim, accruing to the benefit of Jacobs, to which Napoli at least paid lip service. *Cf. United States v. Annerino,* 495 F.2d 1159, 1166 (7th Cir. 1974) (finding extension of credit in unauthorized use of credit cards and theft of partnership funds, followed by repayment agreement); *United States v. Briola,* 465 F.2d 1018, 1020–21 (10th Cir. 1972), cert. denied, 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 688 (1973) (finding extension of credit in debt arising from fraudulent bets placed with bookmaking concern, followed by repayment agreement). Appellants suggest that this case presents merely an aggrieved shopkeeper seeking redress from a self-confessed swindler. We put to one side whether Congress lacks power to punish threats of violence even in such homespun contexts, cf. *United States v. Perez,* 426 F.2d 1073, 1080 (2d Cir. 1970), aff'd, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); appellant Jacobs' strategy for ensuring repayment was hardly commensurate with ordinary notions of self-help.

Concededly, appellants were not involved in a classic loan-sharking operation, the specific evil against which Congress interposed 18 U.S.C. § 894. See *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). However, *Perez* has not been construed to suggest that only those so engaged with proven organized crime connections may constitutionally be convicted under the statute. See *United States v. Keresty,* 465 F.2d 36, 42–43 (3d Cir.), cert. denied, 409 U.S. 991, 93 S.Ct. 340, 34 L.Ed.2d 258 (1972); *United States v. Annerino,* supra, 495 F.2d at 1165. We agree with those courts that *Perez,* having established that Congress has power under the Commerce Clause to proscribe the class of extortionate activities in which appellants engaged, precludes us from " 'excis[ing], as trivial, individual instances' of the class." *Perez v. United States,* supra, 402 U.S. at 154, 91 S.Ct. at 1361.

## V. Conclusion

■ Appellants' remaining contentions require little comment. The trial court was empowered by 18 U.S.C. § 894 to impose separate sentences for participation in the use of extortionate means and conspiracy to do so.[9] Appellant Bufalino urges that the

---

8. Appellants also argue that the district court's questioning of the jurors was leading and incomplete. But as already noted, appellants had ample opportunity to request supplemental inquiries after receiving a transcript of the interrogations. Had any of the jurors evinced some recollection of potentially prejudicial third-party overtures, we have no doubt that the district court's inquiry would have expanded substantially.

9. Both offenses are proscribed, in the disjunctive, by the section. We cannot agree with appellants that "proof of one offense would necessarily prove the other." Certainly one could participate alone in the use of extortion-

trial judge relied on misinformation in pronouncing sentence. But appellant did not avail himself of his opportunity to specifically contest the truth of any such statements during the sentencing proceeding, nor did he request an evidentiary hearing on any of the purportedly false allegations.

■ We have considered appellants' challenges to the trial court's charge to the jury, and find no reversible error. Appellants' contention that they were denied a speedy trial is specious, since the district court properly found that delays otherwise excessive were tolled by the unavailability of an essential prosecution witness. After consideration of all appellants' other arguments, we find merit in none.

The judgment of conviction is affirmed.

ate means, conspiring with no one, or conspire to undertake an extortionate scheme that never ripened into a substantive offense. *Cf. United States v. DeStafano*, 429 F.2d 344, 348 (2d Cir. 1970), cert. denied, 402 U.S. 972, 91 S.Ct. 1656, 29 L.Ed.2d 136 (1971) (casting doubt on validity of argument identical to that advanced here).