UNITED STATES of America, Appellee,

v.

Joseph SEDLAK, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Gary C. GREENWOOD, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

James F. LOMBARD, Defendant,
Appellant.

Nos. 81–1866 to 81–1868.

United States Court of Appeals,
First Circuit.

Argued Sept. 15, 1983.

Decided Nov. 3, 1983.

Certiorari Denied Feb. 21, 1984.
See 104 S.Ct. 1312.

Marvin H. Margolies, Boston, Mass., for Joseph Sedlak.

Anthony M. Traini, Boston, Mass., with whom Leppo & Traini, and Russell R. Weddell, Rehoboth, were on brief, for Gary C. Greenwood.

Paul P. Caradonna, Everett, for James F. Lombard.

Janis M. Berry, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., and Douglas P. Woodlock, Sp. Asst. U.S. Atty., Boston, Mass., were on brief, for appellee.

Before CAMPBELL, Chief Judge, SKELTON,[*] Senior Circuit Judge, and BREYER, Circuit Judge.

SKELTON, Senior Circuit Judge.

The defendants, Joseph Sedlak, Gary C. Greenwood, and James F. Lombard, appeal their convictions in the United States District Court for Massachusetts, in which jury verdicts were returned, after a joint trial, finding them guilty of violations of 18 U.S.C. § 894, for conspiring to use and using extortionate means to collect an extension of credit. The defendants complain of error in the proceedings below, alleging that the indictment lacked sufficient specificity; that there was no underlying extension of credit within the meaning of 18 U.S.C. § 894; that there was error in the court's charge concerning the extension of credit; and that there was insufficient evidence to support the convictions. For the reasons set out below, we affirm the convictions of all three defendants.

## I. Background

On April 23, 1975, defendant Joseph Sedlak entered into an agreement with Martin (Bill) White in which White received $10,000 from Sedlak to purchase used cars, with the understanding that they would split any profits from the sales of those cars. Sedlak told White that he would ask for some of the money from time to time. By September 1975, approximately $3,000 of this money was still in White's possession. At that time, White moved from Massachusetts to Virginia, leaving certain furniture items in storage in Massachusetts. Sedlak removed some of White's furniture from storage while White was in Virginia. When White was in the process of moving back to Massachusetts in August 1976, he met with Sedlak. White, at least, apparently thought Sedlak had agreed to keep the furniture in settlement of White's debt to Sedlak.

However, in June 1977, Sedlak sued White for the balance of the loan made on April 23, 1975. In filing the complaint, Sedlak's attorneys in that action relied on certain papers in Sedlak's possession that referred to the April 23, 1975, transaction as a loan. Although this suit was never prosecuted, the docket sheet from the First District Court of Essex indicates that the case was never dismissed.

Nothing further was said about the matter until about 3:30 in the afternoon of Friday, May 1, 1981, when two men approached White at the automobile dealership where he worked in Wakefield, Massachusetts. The men introduced themselves as "Tony" and "John." At trial, White identified "Tony" as the defendant Gary C. Greenwood and "John" as the defendant James F. Lombard. "Tony" stated that he was there to collect the $10,000 that White owed Sedlak, and "John" said that the matter had been going on too long and he wanted some money that day. Both men displayed guns as they spoke to White. When White explained that he had no money to give them, "John" made a telephone call to a person he identified as "Joe." After "John" made an unsuccessful attempt to telephone "Joe," White told the men that he could not get any money before Monday, and that the men should meet him Tuesday morning. "Tony" suggested that White might be able to get cash from his mother

---

[*] Of the Federal Circuit, sitting by designation.

or that some transaction might be arranged concerning some land of White's mother that "Joe" wanted. When the men left, White noted the license plate number of their car, which was later discovered to belong to Greenwood.

White, who was very upset as a result of the encounter, contacted the FBI, who arranged a consensual monitoring of his conversations. White then called Sedlak, who, after professing to know nothing about the encounter, agreed to meet with White that evening. At the meeting, which took place in White's car, Sedlak stated that the $10,000 obligation had been assigned to other parties, and that "they took over a long time ago," although he denied knowing who "they" were. The transcripts of the tape recordings reveal that Sedlak suggested several means by which White could raise the money, such as selling his car, asking his mother for money, or getting his mother to sell land she owned in Middleton, which bordered on some of Sedlak's land. He also admitted that he had offered to assist the collection agents by contacting White, although he ended by saying he did not know their identities. He finally agreed to contact the men by Monday.

On Monday, May 4, 1981, White called Sedlak to see if he had contacted the men. Sedlak stated that he had handed over the debt and was not involved with it anymore, that the collection agents were dangerous men, and that White should find some way of raising the money.

On the morning of May 7, White had a brief telephone conversation with Sedlak, during which Sedlak reemphasized the danger of the collection agents, asserted that he was not directly involved, and discussed using the Middleton properties as collateral. Evidently, Sedlak owned land which was blocked from any public access by land owned by White's mother, and sought some sort of transaction whereby his land could be sold in conjunction with the mother's land, thereby increasing its value. After this conversation, telephone records show that Sedlak placed a telephone call to Greenwood's residence. Later that morn-

ing, two more telephone calls were made from Greenwood's residence to Sedlak's trailer home.

Around 10 A.M. that same day, White received a phone call at his place of employment from a man who identified himself as "Tom'." White recognized the voice to be that of defendant Lombard. "Tom" told White that Sedlak knew them quite well and asked White if he had the money. Upon receiving a negative answer, he hung up. White then called Sedlak that afternoon and arranged to meet him at the trailer park where Sedlak lived. During that meeting, Sedlak informed White that he had been in contact with the two men, and that he thought he could arrange for an initial payment of $2,000. He also told White that he had a week to come up with the money and repeated the warning that the men were dangerous. Again, he suggested several ways for White to come up with the money.

On the afternoon of May 9, 1981, while White was at his apartment with a friend, Dale Farmer, two men came to the apartment and knocked on the door. When Farmer answered the door, the two men asked to speak to White. White recognized the voices as those of defendants Greenwood and Lombard, and immediately left the apartment by way of a sliding glass window. The two men then forcibly entered the apartment, pushed Farmer to the floor and began searching for White. They told Farmer that this was White's "last strike," threatening him and displaying their guns. As they left the apartment, White positively identified them from his hiding place in the bushes as the two men he had encountered previously. That evening, he spoke to Sedlak about the incident, and Sedlak told him that, "I know if I was in your shoes, if that was me, I wouldn't stay around."

On Monday, May 11, 1981, Greenwood called White, who told him he would have $2,000 that night. Greenwood said he would come by that evening to get the money. That evening, an individual that White had never seen came to White's

apartment and asked for the money. White refused to give him the money and the man left. White called Sedlak and stated that he would only pay the two men that approached him previously. Telephone records of Sedlak's residence show that after this, Sedlak made three telephone calls to the restaurant where Lombard worked as manager. Early on the morning of May 12, White again spoke with Sedlak, who told him that he had spoken with the collection agents and that everything would be worked out. Sedlak told White to meet him at Friendly's Restaurant in Wakefield to work out a payment schedule.

At the meeting on May 12, 1981, a payment schedule was decided upon in which White agreed to pay $2,000 that day, $2,000 in thirty days, and $1,000 a month for the next six months thereafter. That afternoon, Sedlak called White and told him the collection agents were satisfied with the schedule. Sedlak suggested that White should place the money in Sedlak's car around 5 P.M.

White then called the FBI, who gave him an envelope containing $3 \times 5$ cards surrounded by a one dollar bill. White proceeded to the trailer park where Sedlak lived, and placed the money in Sedlak's car. The FBI agents on surveillance saw three small girls take the envelope from the car and hand it to someone in Sedlak's trailer. The FBI agents then moved in and arrested Sedlak. After obtaining a search warrant, the agents searched the trailer. They found notes of telephone calls placed to "Gary" and "Jim" (the first names of defendants Greenwood and Lombard) and a note to "See Jim at 1 P.M. 884–9857" (the phone number of the restaurant that Jim Lombard managed). They also found a schedule in a file labeled "Billy White House-Loan," which began with the entry "1. $10,000 Loan—1975."

Sedlak was indicted by a Grand Jury on May 27, 1981, and charged with conspiring with other unknown persons to use extortionate means to collect an extension of credit from White in violation of 18 U.S.C. § 894, and for participating in the use of

extortion to collect an extension of credit from White in violation of 18 U.S.C. § 894 by directing White to deliver a repayment of money to a location under Sedlak's control in Peabody, Massachusetts. On July 1, 1981, the Grand Jury returned superceding indictments naming Greenwood and Lombard as additional defendants. They were named as coconspirators in Count One, and were charged separately in a new Count Three of the indictment for having participated in using extortionate means to collect an extension of credit by entering White's residence and implicitly threatening to harm him if he did not repay the extension of credit.

After arraignment, the defendants were provided with automatic discovery. They were provided with transcripts of the consensually-monitored conversations between White and the defendants, and other pertinent documents were made available to them. The defendant Greenwood filed thirteen pretrial motions on July 21, 1981, and seven pretrial motions on August 14, 1981. None of these motions contained any reference to the specificity of the indictment. A motion requesting a Bill of Particulars was filed on July 21, 1981, but it was denied by the court, and no further action was taken with respect to this motion. On September 17, 1981, Greenwood filed a motion to dismiss on the ground that the indictment lacked specificity. The trial judge denied this motion, not on timeliness grounds, but on the ground that the indictment contained all the essential elements required by law.

The case was tried before a jury, and on October 22, 1981, guilty verdicts were returned on all counts. The trial judge imposed prison sentences of four years on Sedlak, three years on Greenwood, and two years on Lombard.

## II. The Sufficiency of the Indictment

■ Defendants Greenwood and Lombard contend that the district court erred in denying Greenwood's Motion to Dismiss the Indictment of September 17, 1981. They argue that the indictment was unconstitu-

tionally vague and indefinite and violated the Federal Rules of Criminal Procedure. The rules governing the sufficiency of an indictment are well settled. An indictment is sufficient if it (1) contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and (2) enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). The indictment must be "... a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c).

Greenwood and Lombard attack the sufficiency of Count One of the indictment, arguing that while the indictment names the alleged victim and refers to the general time frame of the alleged conspiracy, it does not mention the date, place or circumstances of the alleged extension of credit or the time or place that the defendants became involved in the conspiracy. Because of these omissions, defendants Greenwood and Lombard contend that it was impossible for them to prepare a defense to the charge. In support of this contention, they rely upon this Court's opinion in the case of *United States v. Tomasetta,* 429 F.2d 978 (1st Cir.1970).

The *Tomasetta* case also involved an indictment under 18 U.S.C. § 894. That indictment, unlike the one in the instant case, failed to name the alleged victim of the offense, and described only in the most general terms the location, time, and substance of the extortionate threats. This Court held that the failure to state the victim's name was fatal under circumstances, because it did not afford the defendant enough particulars to allow him to defend the charge. However, the Court noted that it is not always fatal to omit information concerning location, type of threat, or even the name of the victim.

The government argues that we should not consider the defendants' lack of

specificity claims because the motion to dismiss for lack of specificity was untimely filed. While there may be some merit in that contention, the trial judge did not deny the motion on that ground, and, in our opinion, it is not necessary to consider that point. Instead, we conclude that Count One of the indictment was sufficiently definite and specific to meet the requirements stated above. The victim, Bill White, was named, thus presenting a major distinction from the *Tomasetta* case. The essential elements of the offense were alleged, a fact which defendants Greenwood and Lombard do not dispute. The persons alleged to have been involved in the conspiracy were named, and the general time frame of the occurrence of the conspiracy was identified. We hold that, under the circumstances of this case, Count One of the indictment was sufficiently particular and definite to apprise said defendants of the charge against them so as to enable them to prepare their defense. The failure to include more details concerning the making of the underlying extension of credit did not render the indictment defective, especially since Greenwood and Lombard were not alleged to have been involved at that stage of the case. The charge against them was not extending credit, but conspiring to use extortionate means to collect it.[1] Any information concerning the underlying obligation was merely evidentiary, and could be obtained through the provided discovery.

Greenwood and Lombard also complain of the sufficiency of Count Three of the indictment, charging them with using extortionate means to collect an extension of credit. Count Three is even more specific than Count One, for it specifically states the date and place of the offense, *i.e.,* May 9, 1981, at White's residence. Again, the failure to give particulars regarding the extension of credit does not render the indictment defective. The offense arose at the collection stage of the transaction. The defendants were adequately informed of the offense they were charged with. *See*

---

1. There is no requirement under § 894 that the defendants be involved with the underlying extension of credit. *See United States v. Annerino,* 495 F.2d 1159 (7th Cir.1974).

*United States v. Largent,* 545 F.2d 1039 (6th Cir.1976) *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1117, 51 L.Ed.2d 546 (1977). We hold that the district court did not err in denying Greenwood's Motion to Dismiss the Indictment.

### III. The Extension of Credit

All three defendants contend that they should be acquitted on the ground that there was no extension of credit to White within the meaning of 18 U.S.C. § 891(1). Sedlak argues that although the jury was instructed, and the case was tried, on the theory that extortionate means were used to collect a "loan," the evidence does not warrant the conclusion that a loan ever existed. Greenwood and Lombard assert that no debtor-creditor relationship was ever created between Sedlak and White, but rather the arrangement was in the nature of a bailment. All of the defendants further insist that there must be an existing debt at the time the extortionate means are used in order to convict under the statute, and that in this case the financial arrangement between White and Sedlak had been terminated prior to the time of the alleged extortionate acts.

The defendants' contentions in this regard are in reality attacks on the sufficiency of the evidence. It is well established that we must view the evidence in the light most favorable to the government. *United States v. Cincotta,* 689 F.2d 238, 241 (1st Cir.), *cert. denied,* — U.S. —, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982).

Section 891(1), defining "extension of credit," is very broad in its application and is not confined to what is commonly known as a "loan." *See United States v. Bufalino,* 576 F.2d 446 (2nd Cir.), *cert. denied,* 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978); *United States v. Briola,* 465 F.2d 1018 (10th Cir.1972), *cert. denied,* 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 688 (1973). However, because the trial court apparently instructed the jury in terms of a loan, we will review the record to determine whether there was sufficient evidence to permit the jury to find that there was a loan. As noted above, Sedlak sued White in June 1977, for the "Balance due April 23, 1975, for money loaned." Government exhibits show that Sedlak's lawyers in that case were provided with the names of "people who had knowledge of this loan." In addition, the search of Sedlak's mobile home produced documents referring to a 1975 loan to White. Sedlak, by stating at various times that he had turned the debt over to collection agents, implied that he viewed the debt as assignable, thus negating the idea that it was a bailment. This evidence tends to prove that the parties themselves considered the transaction to be a loan, a fact which the jury was entitled to give great weight. Viewed in the light most favorable to the government, we hold that there was sufficient evidence for the jury to find that Sedlak had made a loan to White which defendants still regarded as outstanding.

As to the continued existence of the debt when the offense was committed, we note that while Sedlak often stated that White owed him nothing, his actions belied his words. Sedlak stated in August 1976, for example, that White owed him no money, and yet he sued White on the loan in July 1977. On May 1, 1981, after White's first encounter with Greenwood and Lombard, Sedlak again asserted that he did not have anything to do with the debt. However, he did admit that he had assigned the matter to others, but thereafter he suggested a way that White could pay the debt that would be satisfactory to Sedlak; *e.g.,* White could convince his mother to sell her adjoining land along with Sedlak's land-locked acreage, which would increase the value of his land. There was ample evidence from which the jury could conclude that Sedlak treated the loan as a continuing debt. The fact that White did not believe that he owed Sedlak any money is not dispositive of the issue. *See United States v. Cheiman,* 578 F.2d 160 (6th Cir.1978), *cert. denied,* 439 U.S. 1068, 99 S.Ct. 834, 59 L.Ed.2d 33 (1979), where the court found an extension of credit existed even when the victim was forced to sign an agreement to pay a false claim. We hold that there was sufficient evidence for the jury to conclude that an extension

of credit in the form of a loan existed between Sedlak and White at the time the extortionate acts occurred.

### IV. The Court's Charge Relating to the Date of the Extension of Credit

Defendants Greenwood and Lombard complain that the trial judge's failure to instruct the jury when the extension of credit was created was error, because the case was tried on the theory that the extension of credit arose on April 23, 1975. Thus, the defendants argue that the jury was allowed to convict them on a finding that the extension of credit arose between May 1 and May 13, 1981—the period during which the extortionate means were used. Greenwood and Lombard took no exception to this portion of the charge and now raise this point for the first time on appeal. Therefore, it cannot be considered unless the charge constituted plain error. Fed.R. Crim.P. 30. We are unable to see any harm or error in the charge, much less plain error. The evidence adduced at the trial was clearly to the effect that the underlying credit transaction took place in April 1975, and no testimony suggested that it occurred in May 1981. We fail to see how the jury could have been misled or the defendants harmed by the court's charge in this regard, and it is clear that no plain error occurred.

### V. Sufficiency of Evidence of Conspiracy and Participation

Defendants Sedlak and Lombard finally contend that there is simply insufficient evidence to connect them with a conspiracy to use extortionate means to collect an extension of credit, or with the use of extortionate means for such purpose. We disagree. Sedlak admits that he turned the obligation over to others, although he strangely claimed not to know who "they" were. This disclaimer as to knowledge was seriously undermined by the papers found by FBI agents in Sedlak's mobile home which referred to Greenwood and Lombard by their first names. He continuously stressed the dangerous natures of the men to White and encouraged him to "con" his mother out of her land to satisfy the debt. He was an integral part of the negotiations between White and the other defendants. Indeed, it is difficult to conceive how Greenwood and Lombard would have known about the Sedlak-White loan or about the land that White's mother owned had Sedlak not informed them of those facts and initiated the whole process. His involvement, culminating in the providing of his car as a drop site for the first payment, goes far beyond that of an innocent intermediary.

Lombard was also shown to be intimately involved in the whole affair between May 1 and May 13, 1981. At the first meeting with White he brandished his pistol while he called "Joe." He was positively identified by White as one of the men who forcibly entered his apartment on May 9, 1981. Numerous phone calls were made by Sedlak to the restaurant that Lombard managed. The evidence clearly connects him with the conspiracy and the use of extortionate means to collect the loan. We hold that the evidence against Sedlak and Lombard was sufficient to support their convictions for both conspiracy and the use of extortionate means to collect an extension of credit.

In conclusion, we have considered all of the contentions of the defendants and have found them to be without merit. The judgments of conviction are therefore affirmed.

*Affirmed.*