731 F.2d 131
 15 Fed. R. Evid. Serv. 387
 UNITED STATES of America, Appellee,
v.
Luis Alphonso HENRIQUEZ, Jose Colon Ortiz, Segundo Zacarias
Ortiz, Juan Andres Julio-Cardales, Joaquim G. Mejia, Olivio
Omelis-Gundis, Felipe Molina Marrujo, Francisco Javier
Gomez, and Rodrigo Roman-Ortiz, Appellants.
 Nos. 458, 459, 466, 531, 588, 461, 460, 485, 462, Dockets
83-1186 to 83-1193, and 83-1241.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 12, 1983.
Decided March 20, 1984.
 
 Carol B. Schachner, Asst. U.S. Atty., New York City (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Gregory J. Wallance, Asst. U.S. Atty., Brooklyn, N.Y., on brief), for appellee.
 Phylis Skloot Bamberger, New York City (Robin Charlow, Legal Aid Society, Federal Defender Services Unit, New York City, on brief), for appellant Gomez.
 Lawrence Farkash, New York City, for appellant Omelis-Gundis.
 Austin V. Campriello, New York City (Polstein, Ferrara & Campriello, New York City, on brief), for appellant Roman-Ortiz.
 Gary Schoer, Forest Hills, N.Y., for appellant Marrujo.
 Stuart R. Shaw, New York City, for appellant Henriquez.
 Frank J. Livoti, Mineola, N.Y., for appellant Colon Ortiz.
 Kenneth Ramseur, New York City, for appellant Segundo Ortiz.
 George S. Popielarski, Brooklyn, N.Y., for appellant Julio-Cardales.
 Millard King Roper, Bellerose, N.Y., for appellant Mejia.
 Before FEINBERG, Chief Judge, and OAKES and PIERCE, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This appeal, coming to us on conditional pleas of guilty preserving several questions,[1] ] raises three issues. The first of these is said to go to "subject matter jurisdiction," the second relates to the constitutionality of the underlying jurisdictional statute, and the third is based on the government's failure to preserve certain tapes. The appellants, all foreign nationals, pleaded guilty to possession with intent to distribute marijuana "on board a vessel subject to the jurisdiction of the United States on the high seas," in violation of 21 U.S.C. Sec. 955a(a) (Supp. V 1981)[2] and 18 U.S.C. Sec. 2 (1976) (aiding and abetting). The United States District Court for the Eastern District of New York, Jacob Mishler, Judge, accepted the defendants' guilty pleas on the condition that the issues of subject matter jurisdiction and the failure to preserve the tapes would be preserved. We remand for further findings in respect to the status of the vessel involved, the "Juan XXIII."
 
 FACTS
 
 2
 On January 5, 1983, at about 3:00 p.m., a single-stack motor vessel was sighted by a U.S. Coast Guard aircraft in international waters approximately 73 miles off Long Island. The vessel was headed for Montauk. Fifty minutes later the vessel had altered its course 180 ?, and by 5:00 p.m. personnel aboard the aircraft observed an individual jettisoning bale-like objects, some 123 of which were counted by the aircraft. The aircraft subsequently dropped a marker buoy at the spot the bales were jettisoned. A Coast Guard cutter was dispatched and three aircraft successively maintained surveillance of the vessel until the cutter arrived in the vicinity at 2:30 a.m. on January 6.
 
 
 3
 The cutter came within sight of the vessel at approximately 7:00 a.m. No identifying markings on the vessel were visible from as close as 300 yards. After several unsuccessful attempts to establish contact by radio or bullhorn, the Coast Guard finally elicited a radio response that the vessel was the Juan XXIII of Honduran nationality, and permission was given to board. Circling the vessel prior to boarding, the boarding party saw two small boards or plaques on the railing just above the pilot house reading "Juan XXIII, Honduras." The boarding party was given the vessel's Honduran registry papers, dated September, 1979, later found by the district court to be counterfeit. Search of the engine room and cargo for a "main beam number" revealed traces of what appeared to be marijuana, the smell of which pervaded the air despite the hold having been washed down with diesel fuel. A field test on the substance indicated the presence of THC, the active ingredient of marijuana. The boarding party returned to the cutter.
 
 
 4
 According to the testimony of Lt. Voiles, who had headed the boarding party, the Coast Guard received word that night, January 6, that the Honduran government refuted the claim to Honduran registry. The following day the Juan XXIII was again boarded. Wooden pallets which had been on the floor of the cargo hold the day before were no longer there. The appellants were taken into custody and the Juan XXIII secured. Meanwhile many of the bales which had been jettisoned had been recovered. Eventually, custody of the crew, contraband, and other evidence was transferred to the Drug Enforcement Administration and prosecution on a two count indictment charging conspiracy to violate 21 U.S.C. Sec. 955a(a) and possession of marijuana with intent to distribute commenced.
 
 
 5
 Motions to dismiss for lack of subject matter jurisdiction were filed on the basis that the United States did not have jurisdiction over Colombian nationals aboard a non-American vessel in international waters. It was also argued that there was insufficient proof that the vessel was "stateless" so as to be subject to the jurisdiction of the United States within section 955a(a),[3] and that the indictment should be dismissed. Next it was argued that the Government's evidence of the air and sea surveillance should have been suppressed because the Coast Guard, in what the United States Attorney called an act of "bureaucratic negligence," destroyed certain tapes which the Magistrate had in effect ordered preserved. Certain other motions now waived were filed. All defense motions were denied, with the judge making findings in connection with the "statelessness" issue that will be discussed below.
 
 DISCUSSION
 Subject Matter Jurisdiction
 
 6
 A. Nexus Requirement. Appellants argue that Congress cannot assert American jurisdiction to prosecute criminally foreigners on non-American vessels anywhere on the high seas in the complete absence of any nexus between the defendants and the United States, even though Congress clearly intended, as it provided in 21 U.S.C. Sec. 955a(h) (Supp. V 1981), "to reach acts of possession, manufacture, or distribution committed outside the territorial jurisdiction of the United States." The district court found, however, that there was a nexus between the defendants and the United States. The court concluded that the defendants possessed marijuana with intent to distribute it in the United States from the fact that the vessel was initially sighted headed towards Montauk Point and then, upon sighting the well-marked Coast Guard aircraft, turned around and took flight in the opposite direction. We do not quarrel with that finding which the court found was "established ... beyond any reasonable doubt." But the law of this circuit, as recently formulated in United States v. Pinto-Mejia, 720 F.2d 248, 260-61 (2d Cir.1983), is that "stateless vessels on the high seas are, by virtue of their statelessness, subject to the jurisdiction of the United States ... even absent proof that the vessel's operators intended to distribute their cargo in the United States...."[4] Thus on either basis--that there was a nexus or that a nexus is unnecessary--the ruling of the district court that there was jurisdiction must be sustained.[5]
 
 
 7
 B. "Statelessness." The question remains whether the Juan XXIII was "stateless," for only stateless vessels or vessels "assimilated to" stateless vessels come under United States jurisdiction pursuant to section 955a(a) and (b). The Government argues that this question was not reserved since it does not fall under the rubric "subject matter jurisdiction," but rather goes to the merits. See Fogel v. Chestnutt, 668 F.2d 100, 105-07 (2d Cir.1981) (Friendly, J.) (elaborating upon judicial confusion between "jurisdiction" and whether the complaint states a cause of action), cert. denied, 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982). But whether or not one agrees with the Government that the Pinto-Mejia panel fell into the trap against which Judge Friendly warned in Fogel, appellants here were entitled to rely on that case's holding that statelessness was an element of subject matter jurisdiction. 720 F.2d at 256-61.[6]
 
 
 8
 We have no doubt that the issue of "statelessness" was preserved for review here under the slippery label of "jurisdiction." At all times below both counsel and court treated the question of statelessness as part of the issue of subject matter jurisdiction, the court referring to it at one point as "some variation" of the jurisdiction issue and, later, "a jurisdiction issue." Moreover, it is more than a bit inconsistent for the Government to argue as it does that Pinto-Mejia was correct in finding that the stateless nature of the vessel is the basis for subject matter jurisdiction under international law, but wrong to treat the question of the vessel's status as one going to subject matter jurisdiction. In any event, like the panel in Pinto-Mejia, we will treat the issue as preserved for review as the parties and district court intended it to be.
 
 
 9
 On the hearing below the Government's evidence adduced to show statelessness was as follows. First, there was the direct evidence of the observations of the vessel. Unlike most vessels, this vessel was not flying a flag and lacked a main beam number. The sole reference to Honduras on the vessel was on the two small plaques, "Juan XXIII, Honduras," on the railing above the bridge. Second, there was the hearsay testimony of Lieutenant Voiles, the head of the boarding party, that a message was received on the evening of January 6, 1983 in response to a request by the Coast Guard cutter that Honduras refuted the Juan XXIII claim of registry. The testimony did not indicate who arrived at that conclusion, how it was arrived at, or through what channels the information passed. Cf. United States v. Yakobov, 712 F.2d 20, 23-24 (2d Cir.1983) (proof of lack of registration not satisfied by hearsay statements inadmissible under Fed.R.Evid. 803(10)).[7] Third, the Government produced a Honduran Certificate of Non-Registry, dated February 11, 1983, issued under the seal of the Commandant General of the Honduran Navy, duly authenticated and stating that a search had been conducted
 
 
 10
 of the Records on the Registration of the vessel "M/V Juan XXIII" pursuant to the request from the Government of the United States of America. The results of the said search have been negative, as I was unable to locate any records such as are regularly kept by the Government of Honduras. Therefore, the Government of Honduras concludes that the "M/V Juan XXIII" is not a Honduran registration vessel.
 
 
 11
 To counter the Government's evidence, the appellants produced Ralph Addonizio, a private investigator who had been advised by the Honduran Consul General that the Juan XXIII's Honduran registration appeared to be authentic, but that he, the Consul General, would only testify at the request of the United States Government. The Consul General said he would cable Honduras as to the authenticity of the 1979 papers. Addonizio so testified and, when on his cross-examination the government introduced its Certificate of Non-Registry (and a translation thereof), the court directed the witness to take the Certificate and translation to the Consul General and to report back. He did so and reported as a court witness that the Consul General said that the Certificate seemed genuine, that his cable inquiring as to the 1979 papers had not been answered, and that some 500 ships had had their Honduran registrations cancelled in 1983.[8] The Honduran Consul ultimately did not testify, nor was any answer to his cable of inquiry or report of it adduced. On the foregoing the district court found that the vessel was stateless and that its 1979 registration certificate "was a counterfeit certificate and it simulated or assimilated the certification of registry in Honduras."
 
 
 12
 At oral argument on this appeal much discussion ensued as to what the Government's burden of proving statelessness was, the argument touching upon standards ranging from some evidence to a mere preponderance of the evidence and to beyond a reasonable doubt.[9] Without getting into this question, which subsumes or may subsume questions as to whether statelessness is a matter going to subject matter jurisdiction or is an element of the crime (as to which see supra note 6 and accompanying text), as well as questions pertaining to the Government's burden of proof on a conditional plea of guilty, remand for the district court to consider these issues in the first instance. We note that there was vigorous briefing and argument on appeal on the question whether the proof here was sufficient to establish that on January 6-7, 1983, when the vessel was searched and seized and appellants arrested, it lacked a valid Honduran certificate. For all that appears the 1979 papers could have been genuine and the registry cancelled between January 6-7 and February 11, the date of the Certificate of Non-Registry; under such a scenario all papers were genuine. There may well be insufficient evidence to support a finding of counterfeiting. Far preferable would be a certificate of non-registry which satisfies the requirements of Fed.R.Evid. 803(10) that speaks to the date of search and seizure, or a similarly valid showing of prior cancellation of the 1979 papers or non-registration in the first instance. See United States v. Fitzpatrick, 581 F.2d 1221, 1223 (5th Cir.1978) (allegation that bank robbed was insured by FDIC; proof must relate to day of robbery).
 
 
 13
 On this basis, appellants would have us reverse the district court outright and dismiss the indictment, going so far as to suggest that the double jeopardy clause of the Fifth Amendment is involved. We view the suggestion as unavailing since this was, after all, a conditional guilty plea, cf. Forman v. United States, 361 U.S. 416, 425-26, 80 S.Ct. 481, 486-87, 4 L.Ed.2d 412 (1960) (no double jeopardy on retrial after conviction reversed and remanded). Accordingly, exercising our power to determine cases under 28 U.S.C. Sec. 2106 (1976), see Forman v. United States, 361 U.S. at 425, 80 S.Ct. at 486, as the court did implicitly in Pinto-Mejia, 720 F.2d at 258, we remand so that the district court may determine the appropriate standard of proof and make further findings, with the Government to have the opportunity to adduce evidence sufficient to satisfy whatever burden it may have.
 
 Coast Guard Tapes
 
 14
 Lieutenant Commander D'Alessandro, as liaison between the Coast Guard District Legal Office and the United States Attorney's Office in this case, was responsible for supervising the gathering of evidence. Coast Guard Operations Center (OPCEN) in New York is responsible for keeping track of cases involving Coast Guard operational units away from base. It maintains twenty-four hour continuously running tape recordings of all ship to ground communications, as well as search and rescue chronological logs ("chronologs") and message traffic of ships within its jurisdiction. The twenty-four hour tapes record all telephone conversations with field units. Simultaneously with the recordings Coast Guard personnel make entries in the chronolog reflecting the substance of the conversations. The tapes are stored at OPCEN for thirty days and then routinely reused for budgetary reasons.
 
 
 15
 Sometime at or near the time of this case OPCEN formulated a policy which required any office requesting that the original tapes be retained beyond thirty days either to provide replacement tapes or sufficient funds to buy them, a policy which Lieutenant Commander D'Alessandro learned of only in late January, 1983. Defense attorneys requested the production of all tape recorded material relating to this case, and this request was embodied in a magistrate's order. Subsequently, D'Alessandro prepared a memorandum requesting the participating units to preserve "all tapes, logs, records, etc.," and the memorandum was sent to New York OPCEN, Boston OPCEN, the Boston Communications Center which monitors all Coast Guard aircraft operations in the North Atlantic and routinely relays messages to New York OPCEN, various other air stations and the vessels which were or might be involved. In response to the written request for preservation of all evidence, New York OPCEN advised the District Legal Office of its new policy. Evidently, however, the reply was directed to D'Alessandro's superior, Commander Matthews, and no adequate response was made, so that the tapes in question were routinely reused after thirty days. Re-use of course means erasure.
 
 
 16
 Appellants unsurprisingly complain that this erasure either deprived them of their rights to due process and a fair trial or that the court should at least have precluded the Government from using at trial testimony pertaining to the surveillance and seizure of the Juan XXIII. The Government, on the other hand, claims that the appellants were in no way prejudiced because the information was contained in the chronologs and message traffic files summarizing what had been taped at OPCEN and Boston Communication Center and, moreover, personnel from the cutter had made their own cassette recordings of the actual boarding, and these were played for all the defendants and their attorneys in advance of the suppression hearing.
 
 
 17
 This court was somewhat surprised to learn that the District Legal Office responsible for law enforcement cases for the Coast Guard was not familiar with our decisions in United States v. Bufalino, 576 F.2d 446 (2d Cir.) (destruction of tapes), cert. denied, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978), or United States v. Paoli, 603 F.2d 1029, 1036-37 (2d Cir.) (destruction of notes), cert. denied, 444 U.S. 926, 100 S.Ct. 264, 62 L.Ed.2d 182 (1979). A Coast Guard legal officer testified that he did learn of United States v. Grammatikos, 633 F.2d 1013 (2d Cir.1980), but only after he told the prosecuting attorney that the tapes in this case had been destroyed. The majority opinion in Grammatikos said that "[t]he government has long been on notice of its duty to preserve discoverable evidence and has been repeatedly warned of the jeopardy in which it places its prosecutions when it disregards this obligation." Id. at 1019. Bufalino had also warned thatwe will look with an exceedingly jaundiced eye upon future efforts to justify non-production of a Rule 16 or Jencks Act "statement" by reference to "department policy" or "established practice" or anything of the like.... Where, as here, destruction is deliberate, sanctions will normally follow, irrespective of the perpetrator's motivation, unless the Government can bear the heavy burden of demonstrating that no prejudice resulted to the defendant.
 
 
 18
 576 F.2d at 449. This warning was explicitly reiterated in Paoli, 603 F.2d at 1036.
 
 
 19
 This matter has given us considerable difficulty. The trial judge found no intent to destroy evidence and "absolutely no prejudice to the defendants" since the logs "clearly support the oral testimony given...." He also found that there is no question but that "quantities of marijuana were aboard the vessel...." We ultimately resolve the issue as did Grammatikos and the First Circuit case of United States v. Arra, 630 F.2d 836, 849 (1st Cir.1980), also involving the Coast Guard, this time in favor of the Government. We do so, however, with full recognition of Judge Frank's admonition in United States v. Antonelli Fireworks Co., 155 F.2d 631, 661 (2d Cir.1946) (dissenting opinion), that affirmance in these circumstances makes the "deprecatory words we use in our opinions on such occasions ... purely ceremonial."
 
 
 20
 So that we will not again be in the position in which the Coast Guard has cast us in this case, in the exercise of our supervisory powers, we direct the United States Attorney to advise the United States Coast Guard and each and every agency referred to at page 11 of the Government's brief[10] that in the future deliberate, negligent or other destruction of tapes, whether for budgetary reasons or otherwise, will not be tolerated by this court. We direct further that the United States Attorney report back to this court within 90 days advising us of the warnings given and the replies received.
 
 
 21
 Judgment reversed and remanded in accordance with the opinion.
 
 
 
 [1]
 We have repeatedly suggested that caution be used when accepting guilty pleas subject to a variety of conditions because they tend to undercut finality in the criminal process and create unneeded appellate litigation. E.g., United States v. Burns, 684 F.2d 1066, 1071 (2d Cir.1982), cert. denied, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983); United States v. Thibadeau, 671 F.2d 75, 79-80 (2d Cir.1982). This case well illustrates the basis for our concern
 
 
 [2]
 21 U.S.C. Sec. 955a(a) provides:
 It is unlawful for any person on board a vessel of the United States or on board a vessel subject to the jurisdiction of the United States on the high seas, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.
 
 
 [3]
 21 U.S.C. Sec. 955b(d) provides:
 "Vessel subject to the jurisdiction of the United States" includes a vessel without nationality or a vessel assimilated to a vessel without nationality, in accordance with paragraph (2) of article 6 of the Convention on the High Seas, 1958.
 
 
 [4]
 While a commentator, Note, High Seas Narcotics Smuggling and Section 955a of Title 21: Overextension of the Protective Principle of International Jurisdiction, 50 Ford.L.Rev. 688 (1982), suggests that absent a territorial nexus marijuana trafficking does not fall within any of the principles of international law justifying the assertion of extraterritorial jurisdiction, two other circuit courts of appeal have agreed with the statement of Pinto-Mejia. United States v. Marino-Garcia, 679 F.2d 1373 (11th Cir.1982), cert. denied sub nom. Pauth-Arzuza v. United States, 459 U.S. 1114, 103 S.Ct. 748, 74 L.Ed.2d 967 (1983); United States v. Howard-Arias, 679 F.2d 363 (4th Cir.), cert. denied, 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 136 (1982). In any event, United States courts are obliged to enforce congressional enactments and not international law when the two conflict unless the law would violate the due process clause of the Fifth Amendment. Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326, 1334 (2d Cir.1972)
 
 
 [5]
 It is also argued that 21 U.S.C. Sec. 955a(a) as applied violates the notice requirement of the due process clause of the Fifth Amendment. See Lambert v. California, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957); United States v. Mancuso, 420 F.2d 556 (2d Cir.1970); United States v. Sansone, 385 F.2d 247 (7th Cir.1967) (customs agents had duty to inform defendant of registration requirement). The argument is based not only on the claim that the statute is "unprecedented in international law" and the proposition that marijuana trafficking itself is not universally condemned, but also on the alleged vagueness of the definition of "vessel without nationality" in 21 U.S.C. Sec. 955b(d), supra note 3. On this point, however, we agree with the Eleventh Circuit in United States v. Marino-Garcia, 679 F.2d at 1383-84, that the term "vessel without nationality" clearly encompasses vessels not operating under the authority of any sovereign nation
 
 
 [6]
 As Judge Friendly pointed out in Fogel v. Chestnutt, 668 F.2d at 107, even the highest Court has fallen into the same word trap. E.g., Kissinger v. Reporters Committee for Freedom of the Press, 445 U.S. 136, 149-50, 100 S.Ct. 960, 967-68, 63 L.Ed.2d 267 (1980). See generally United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 39, 73 S.Ct. 67, 70, 97 L.Ed. 54 (1952) (Frankfurter, J., dissenting) ("I do not use the term 'jurisdiction' because it is a verbal coat of too many colors.")
 
 
 [7]
 While this evidence might well establish probable cause to search and seize the vessel, the lawfulness of the search and seizure is a matter in no way in issue. It surely is not admissible evidence as to the fact of statelessness
 
 
 [8]
 Appellants' counsel was not allowed to offer into evidence testimony which allegedly would have shown that a military junta was in power in Honduras at the time that the Juan XXIII's documents were purportedly prepared. If established to be a fact, this might also help explain why a later Honduran government might have no record of the registration
 
 
 [9]
 The briefs did not address this issue except in generalities. On remand perhaps the parties will give the district court the benefit of counsel's research on these points
 
 
 [10]
 That is, New York OPCEN, Boston OPCEN, Boston Communications Center, Air Station Cape Cod, Air Station Brooklyn, Group Shinnecock, Long Island, and Air Station Elizabeth City