# United States Court of Appeals
## For the First Circuit

Nos. 13-2462
     14-1127

UNITED STATES,

Appellee,

v.

KARAPET DZHANIKYAN AND RONALD J. MARTINEZ,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Barron, Selya, and Lipez,
Circuit Judges.

Amy M. Belger for appellant Dzhanikyan.
Derege B. Demissie, with whom Demissie and Church was on brief, for appellant Martinez.
Kelly Begg Lawrence, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

December 11, 2015

BARRON, **Circuit Judge**.  In these consolidated criminal appeals, Karapet Dzhanikyan and Ronald Martinez raise a number of challenges to their convictions, including some that concern the District Court's decision to try the two men together.  For the reasons set forth below, we affirm each of the convictions except for Martinez's conviction for conspiring to use extortionate means to collect an extension of credit in violation of 18 U.S.C. § 894(a).

## I.

The initial indictment charging Dzhanikyan and Martinez was handed down in 2011 and arose out of a year-long wiretap investigation of a suspected drug trafficker named Safwan Madarati.  A superseding indictment, containing eleven total counts and naming fifteen defendants, was handed down in 2012.

Five counts of the superseding indictment named Dzhanikyan or Martinez.  Dzhanikyan was charged with one count of conspiring with Madarati and others to distribute oxycodone, in violation of 21 U.S.C. § 846 (Count 1).  Martinez was charged with two counts of conspiring with Madarati and others to attempt to collect a debt through extortionate means, in violation of 18 U.S.C. § 894(a) (Counts 2 and 3), and two counts of possessing crack cocaine with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1) (Counts 10 and 11).

Before trial, Martinez moved to be tried separately from all of his co-defendants, including Dzhanikyan. Martinez also moved to be tried separately on each of the four counts he faced. In January of 2013, the District Court denied Martinez's motions for severance. Dzhanikyan made no pre-trial severance motion.

By the time the trial began on June 3, 2013, all of the co-defendants of Dzhanikyan and Martinez had pleaded guilty. The trial thus proceeded with only Dzhanikyan and Martinez as defendants.

After the presentation of the evidence at trial, Martinez moved under Federal Rule of Criminal Procedure 29(a) for acquittal on all the counts for which he had been charged. The District Court granted Martinez's motion as to the first of the two counts that had charged him with using extortionate means to collect an extension of credit (Count 2). That extortion count charged Martinez with conspiring to use extortionate means to collect an extension of credit by Madarati to a jewelry store owner. The alleged extortionate means involved shooting the store's windows and resulted in injuries to several people.

The District Court denied Martinez's motion as to the remaining counts against him, including as to the second extortion count (Count 3). That extortion count charged Martinez with conspiring to use extortionate means to collect a separate extension of credit by Madarati. The alleged extortionate means

involved an attempted break-in of the house of the purported debtor.

Following the District Court's ruling on the Rule 29(a) motion, jury deliberations began. In the midst of the deliberations, the jury submitted two questions to the District Court. One of those questions is at issue in these appeals: "Can we use all the evidence presented during the trial as we evaluate each individual charge?" The District Court proposed to answer that question by saying simply, "Yes."

Martinez's counsel raised a concern about the proposed answer. She requested that the District Court make clear that the jury could not rely on evidence from Martinez's by-then dismissed, jewelry-store extortion count in considering (at least) the remaining extortion count against Martinez. Martinez's counsel did not actually propose such an instruction, however. Martinez's counsel explained that she would need some time to come up with the right wording. The District Court made clear that in its view there was no need for any limiting instruction. Dzhanikyan raised no objection to the District Court's proposed answer to the jury's question.

The District Court called the jurors back into the courtroom and told them that the answer to their question was, "Yes." After addressing the jury's other question, the District Court asked the jury: "And you understand the use of all of the

- 4 -

evidence with respect to each charge as it applies to that charge?" The jury responded by "nodding."

The jury returned guilty verdicts against Dzhanikyan and Martinez on all four remaining counts. Following the verdicts, the defendants moved for both a judgment of acquittal under Federal Rule of Criminal Procedure 29(a) and a new trial under Federal Rule of Criminal Procedure 33.[1] The motion for a new trial contended that the District Court's "Yes" response to the jury's question resulted in "evidentiary spillover," a "variance," and "retroactive misjoinder." The District Court denied the defendants' Rule 29(a) motions and their joint motion for a new trial.

In considering the defendants' challenges on appeal, we start with their individual challenges to the District Court's initial decision to try them together and to the District Court's denial of their joint motion for new trial. We then consider Martinez's separate challenges to his extortion conviction on Count 3.

**II.**

"[A] trial judge has 'considerable latitude' in deciding severance questions," and thus, even when a challenge to a decision to try a defendant jointly has been properly preserved, "the

---

[1] Technically, Martinez filed a motion for a new trial and then Dzhanikyan moved to join that motion.

judge's resolution of [those questions] 'will be overturned only if that wide discretion is plainly abused.'" United States v. O'Bryant, 998 F.2d 21, 25 (1st Cir. 1993) (quoting United States v. Natanel, 938 F.2d 302, 308 (1st Cir. 1991)). An abuse of discretion in declining to sever a trial may be found, however, if a defendant "who seeks a separate trial can . . . mak[e] a strong showing of evident prejudice." Id. And that strong showing may be made "if there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence." Id. (quoting Zafiro v. United States, 506 U.S. 534, 539 (1993)). With that background in place, we now turn to the challenges the defendants bring -- both individually and jointly -- to the decision to try them together.

**A.**

Dzhanikyan contends that there was a serious risk here that, in consequence of the joint trial, the jury would not be able to render a reliable verdict because the evidence the government intended to put forth about Martinez's involvement in the two alleged extortion schemes was "highly inflammatory and prejudicial."[2] Dzhanikyan did not raise this challenge below,

---

[2] The evidence concerning Count 2 included testimony that a man the government maintained was Martinez shot bullets through the windows and display cases of a jewelry shop, injuring several bystander employees of the shop. The evidence concerning Count 3 included testimony that a man the government named as Martinez

- 6 -

however, and so his challenge, if not waived, is subject to review only for plain error.  See United States v. Magana, 127 F.3d 1, 7 (1st Cir. 1997) (reviewing unpreserved misjoinder claim for plain error).[3]

To satisfy the demanding plain-error standard, Dzhanikyan must show that "(1) an error occurred, (2) the error was obvious, (3) the error affected substantial rights, and (4) the error seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. Lanza-Vázquez, 799 F.3d 134, 145 (1st Cir. 2015) (citation and internal quotation marks omitted).  But he cannot make that showing.

It is not obvious that the government's evidence about Martinez's use of extortionate means to collect an extension of credit would create a serious risk that the jury would be prevented from making a reliable judgment about Dzhanikyan's role in committing the distinct and unrelated drug conspiracy crime for which he was charged.  That evidence, to be sure, did involve

---

attempted to break into the home of a purported debtor in the middle of the night.

[3] The government argues in its brief that this argument has actually been waived because Dzhanikyan made no timely motion for severance under Federal Rule of Criminal Procedure 12(b)(3).  See United States v. Oquendo-Rivas, 750 F.3d 12, 17 (1st Cir. 2014) (finding waiver in the context of another untimely 12(b)(3) motion).  But we need not decide here when a failure to file a pre-trial motion to sever might constitute a waiver, because Dzhanikyan's challenge fails even if we apply the plain-error standard.

descriptions of very violent activity. But given the minimal risk that the jury would believe that the evidence against Martinez pertaining to extortion was relevant to the government's case against Dzhanikyan for drug distribution, we conclude that Dzhanikyan has not shown that the District Court plainly erred in exercising its broad discretion to decide whether to sever Dzhanikyan's trial from that of Martinez. See United States v. De La Paz-Rentas, 613 F.3d 18, 23 (1st Cir. 2010) (rejecting a defendant's severance challenge where the trial included "substantial" evidence of his co-defendants' gun dealings -- with which the defendant had no involvement -- but where "there was no reason for the jury to be confused about [the defendant's] role").

**B.**

Before trial, Martinez offered a different reason for contending that the District Court should try the two defendants separately. Martinez contended that the decision to try the two of them together risked prejudicing the jury's ability to make a reliable judgment about whether Martinez intended to distribute the crack cocaine that he was charged with possessing.

On appeal, the government contends that Martinez has failed to renew this challenge to us and that this challenge has therefore been waived. But even assuming the government is wrong on that score, Martinez's challenge to the District Court's decision not to sever his trial from Dzhankiyan's still fails.

Martinez bases his severance argument on the evidence that the government was to put forth concerning Dzhanikyan's alleged involvement in Madarati's alleged drug-distribution conspiracy. That evidence concerned Dzhanikyan's alleged travel to California to make substantial purchases of oxycodone pills on behalf of Madarati. Martinez contends that this evidence regarding his co-defendant's alleged involvement in drug distribution would prejudice the jury's evaluation of whether Martinez possessed the requisite intent to distribute the drugs that he was charged with possessing.

Martinez points out that other evidence supported his contention that he possessed the drugs for personal use. And he points in that regard to the trial testimony of an expert witness that the amount of crack cocaine with which Martinez was charged with possessing -- 3.25 grams of crack cocaine -- was consistent with possession for personal use rather than with possession with an intent to distribute.

But Martinez does not contend on appeal that his trial on the extortion counts should have been severed from his trial on the crack cocaine possession count. And thus Martinez necessarily concedes that even if his trial had been severed from Dzhanikyan's, the jury still would have been exposed to evidence about Madarati's drug distribution conspiracy. After all, to show that Martinez conspired to use extortionate means to collect an extension of

credit, as Count 3 alleged, the government needed to put forward evidence that there was an "extension of credit." And the government's case in that regard consisted, in significant part, of evidence that a man named Victor Loukas had traveled more times to California on behalf of Madarati than had Dzhanikyan, and as part of Madarati's drug-distribution conspiracy, to buy more total oxycodone pills for more money than had Dzhanikyan.

In consequence, any severance challenge Martinez makes on appeal necessarily amounts only to a complaint about the incremental additional risk of prejudice that would arise from the jury hearing more about a topic about which the jury would already have heard much. We thus do not see how Martinez can successfully contend that the jury's exposure to the additional evidence about drug distribution that pertained to Dzhanikyan created the kind of "serious" risk of prejudice that could suffice to show that the District Court abused its discretion in deciding to try Martinez and Dzhanikyan together. See O'Bryant, 998 F.2d at 25, 27. We thus reject Martinez's challenge to the District Court's initial decision to decline to sever his trial from that of his co-defendant.

## C.

Looking past the District Court's initial decision not to sever the trials of Martinez and Dzhanikyan, the defendants contend -- as they did in their joint motion for new trial -- that

- 10 -

they were impermissibly prejudiced once the trial began by the "yes" answer that the District Court gave to the jury's question about which evidence the jury could use. Specifically, the defendants renew their contention that the District Court's answer to the jury's question caused "evidentiary spillover," resulting in a "variance," in which the crimes charged against them varied from the crimes for which they were ultimately convicted, see United States v. Dellosantos, 649 F.3d 109, 116 (1st Cir. 2011), or a "retroactive misjoinder," in which trying the defendants together was rendered improper by developments at trial, see United States v. Mubayyid, 658 F.3d 35, 72 n.39 (1st Cir. 2011).

But the defendants' contention does not hold up. "[I]nstructions must be evaluated not in isolation but in the context of the entire charge." Jones v. United States, 527 U.S. 373, 391 (1999). And once the District Court's answer to the jury is considered in this way, it becomes clear that the District Court's answer to the jury's question did not give rise to the concern about the claimed "evidentiary spillover" on which the defendants' variance and retroactive misjoinder challenges depend.

In its main charge, the District Court expressly instructed the jury that the defendants were "charged with different crimes" and that the jury had a duty to "consider the evidence separately as to each defendant and as to each count which a defendant is charged." The District Court then explained each

count as it related to each defendant and instructed the jury what it would need to find to convict each defendant on each count.[4] And, finally, the District Court sought to confirm the jury's proper understanding of the instructions as a whole. The District Court did so by saying, after offering its "yes" answer to the

---

[4] On Dzhanikyan's conspiracy charge, the District Court explained as follows: "Let me turn now to Count 1, which is the specific conspiracy to distribute OxyCodone, and only Mr. Dzhanikyan is charged in that. . . . So, review the evidence, what was Mr. Dzhanikyan's conduct in connection with the purchase and sale of any pills, what conversations did he have with Mr. Madarati or others, what did he know about any agreement among Madarati and others to distribute drugs, and then determine whether there was an agreement to distribute OxyCodone as charged, and then whether the government has proven that Mr. Dzhanikyan did knowingly and intentionally join in the conspiracy."

On Martinez's conspiracy-to-extort charge, the court explained: "The next count is Count 3, which pertains to only Mr. Martinez. . . . Again, review the evidence, consider evidence of Mr. Madarati's and Kabba's conversations. What, if anything, did Mr. Martinez do or attempt to do? What, if any, financial arrangements existed between Mr. Loukas and Madarati? In particular, had Madarati made a loan to Loukas or agreed to defer repayment of an existing debt? That is, was there a loan or an extension of credit to Loukas by Madarati or any co-conspirator? If there was not, then the defendant cannot be found guilty."

And on Martinez's charges of possession with intent to distribute, the court explained: "You need to look at all the evidence and decide whether he intended to sell it or give it away or transfer it to somebody else or whether he had this cocaine only for his personal use. . . . You may take into account how much cocaine he had, and you must certainly look at his state of mind about this, because intent to distribute, again, involves the defendant's state of mind. So, you need to infer that from his words, his conduct, and all of the surrounding circumstances . . . ."

Finally, the court concluded the charge by reiterating: "And, again, the government has to prove each and every element of each offense and only if the government proves each element of each offense, can you find the defendant guilty."

jury's question about what evidence could be "used": "And you understand the use of all of the evidence with respect to each charge as it applies to that charge?"

Thus, considered in the context of the instructions as a whole, the District Court's one-word affirmative answer to the jury's question did not effectively instruct the jury that it could use evidence of one crime to make a judgment of guilt about a separate crime to which that evidence had no relation. Accordingly, the defendants' challenge to the District Court's denial of the motion for a new trial must fail.

### III.

We now turn to Martinez's separate challenges to his conviction on Count 3. In that count, the government charged Martinez with violating 18 U.S.C. § 894(a) by conspiring with Madarati and another man (named Kabba) to use extortionate means to attempt to collect an "extension of credit" that had been made by Madarati.

### A.

Martinez raised his sufficiency-of-the-evidence challenge in his motion for acquittal, and so we review the record de novo. See United States v. Munyenyezi, 781 F.3d 532, 536 (1st Cir. 2015). In doing so, we view the evidence and all reasonable inferences that can be drawn from it in the light most favorable to the verdict. Id. We may reverse the conviction only if on the

- 13 -

basis of this evidence "no rational jury could have" found Martinez guilty beyond a reasonable doubt.  Id.

Thus, to sustain Martinez's conviction on this count, the government must show that there was sufficient evidence from which a rational jury could find not only that Martinez conspired to use extortionate means, but also that Martinez had used those means to collect payment for an underlying "extension of credit" from Madarati.  Martinez contends that there was not sufficient evidence to support the conviction because the record provides too little evidence that Madarati had made an "extension of credit." And we agree with Martinez on this point.[5]

**B.**

In evaluating Martinez's challenge, we start with the text of the criminal statute and how it defines what an "extension of credit" is.  Under 18 U.S.C. § 894(a)(1), it is a crime to "knowingly participate[] in any way, or conspire[] to do so, in the use of any extortionate means . . . to collect or attempt to collect any extension of credit."  The statute then defines "[t]o extend credit" as "to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction

_____

[5] We thus need not consider Martinez's other ground for challenging this conviction -- his contention that he was subjected to a retroactive misjoinder on Counts 2 and 3 after the District Court granted his motion for acquittal on Count 2, due to the prejudicial effect of the jury's exposure to the evidence the government put forth against him on the acquitted count.

of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred." Id. § 891 (1).

The government charged Martinez with conspiring with Madarati to use extortionate means (making threats and planting evidence) to attempt to collect an alleged "extension of credit" that Madarati had made to Victor Loukas.  Loukas was the man who took two trips to California to purchase thousands of dollars of oxycodone pills for Madarati with Madarati's money.

In giving Loukas money to buy pills for Madarati, Madarati was not fronting money to Loukas for his personal use. Madarati was supplying Loukas with the means to perform a service for Madarati -- namely, purchasing drugs that Madarati could then re-sell.  Thus, consistent with its presentation to the jury below, the government does not argue on appeal that, in giving the money to Loukas to make the purchases, Madarati made a "loan" within the meaning of § 891.  Cf. United States v. Bruce, 405 F.3d 145, 149-50 (3d Cir. 2005).[6]

But, as the plain text of § 894 reveals, the statute has a broad reach and clearly bars the use of extortionate means to

---

[6] In addition to the money that Loukas received from Madarati to buy the pills for Madarati, Loukas also testified that Madarati paid him $10,000 for the two solo trips to California that Loukas made on Madarati's behalf.  The government does not argue that such a payment for services constituted a loan within the meaning of § 894, and we agree that it did not.

collect payment for more than traditional "loans." See United States v. Hoyle, 237 F.3d 1, 6 (1st Cir. 2001) (citing United States v. Sedlak, 720 F.2d 715, 720 (1st Cir. 1983)). In particular, the statute covers any attempt to use extortionate means to collect "an extension of credit." And the statute defines that phrase expansively, so that it encompasses any "agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred." 18 U.S.C. § 891(1).

The key question, therefore, is whether the record supplies "sufficient indicia" of such an agreement. See Hoyle, 237 F.3d at 7 (finding "sufficient indicia of agreement . . . to conclude that an agreement to defer payment of the debts existed"). Before delving into what the record shows about whether such an "agreement" existed here, however, we need to say more about what is meant by the requirement that there be an "agreement."

In our last case addressing the issue, Hoyle, 237 F.3d at 6-7, we noted that the Third Circuit has reasoned (in upholding the sufficiency of an indictment under § 894) that "[w]hen a self-styled creditor appears before his 'debtor' and demands satisfaction, the creditor posits both a debt and the prior deferral of its repayment." United States v. DiPasquale, 740 F.2d 1282, 1287 (3d Cir. 1984); see Hoyle, 237 F.3d at 6. And the Third Circuit has cited the rule of DiPasquale in finding sufficient

evidence of an "agreement to defer" payment -- and thus an "extension of credit" -- to support convictions under § 894 on at least two occasions.  See Bruce, 405 F.3d at 149-50; United States v. Traitz, 871 F.2d 368, 387-88 (3d Cir. 1989); cf. Hoyle, 237 F.3d at 6 (finding it unnecessary under the circumstances to rely on DiPasquale to uphold the conviction).

But to the extent DiPasquale suggests that a mere demand for payment, or even that a demand for payment that is not immediately followed by the use of extortionate means, suffices to show that there has been an agreement to defer payment and thus an "extension of credit," we disagree.  By its plain terms, the statute distinguishes a mere debt from an "extension of credit" on the basis of whether there has been an agreement to defer payment. See United States v. Boulahanis, 677 F.2d 586, 590 (7th Cir. 1982) ("Section 894 does not make it a crime to use extortion to collect debts, but only to exact repayment of credit previously extended.").

Thus, when there is not a loan, we hold -- consistent with the decisions of a number of our sister circuits -- that the government must prove that the creditor manifested an assent (even if only unilaterally and even if only tacitly) to defer payment. See United States v. Wallace, 59 F.3d 333, 339-40 (2d Cir. 1995); United States v. Stokes, 944 F.2d 211, 215 (5th Cir. 1991) ("[P]roof of some manifestation by the creditor of his assent to

defer, however minimal, burdens the government's case."); Boulahanis, 677 F.2d at 590 ("The extension of credit is a deliberate act by a creditor.").[7]  Only then is there sufficient evidence of an "agreement . . . whereby the repayment or satisfaction of any debt or claim . . . may or will be deferred." 18 U.S.C. § 891(1).

Accordingly, in reviewing the record here, we are looking not merely for evidence of a demand for immediate payment. We are looking for what we found in Hoyle: "sufficient indicia of agreement . . . to conclude that an agreement to defer payment of the debt [] existed."  See Hoyle, 237 F.3d at 7.  Absent such evidence, the conviction must be reversed.

The question of exactly what constitutes evidence of an "agreement" for legal purposes is often not susceptible to a rule-like answer.  Rather, one must consider the facts in light of the context.  And this is true for the "agreement" referenced in § 891.

The same actions or communications may carry different implications depending on that context.  In some circumstances,

---

[7] We recognize that in Hoyle, we expressly "decline[d] to give [] much weight" to Boulahanis, Stokes, and Wallace, in part because we thought they "require[d] more than [wa]s required in our decision in Sedlak."  Hoyle, 237 F.3d at 6.  On further review, however, we do not see a meaningful conflict between those cases and Sedlak, at least with respect to the kind of evidence that suffices to show an "agreement to defer."  In fact, Sedlak did not address that issue at all, because it found a loan, not an agreement to defer.  See Sedlak, 720 F.2d at 720-21.

- 18 -

for example, a creditor's silence might fairly be characterized as a tacit agreement to defer payment -- such as where the creditor faces his debtor and stays silent rather than making or implying a demand for immediate payment.  See Hoyle, 237 F.3d at 6-7.  But in others, the creditor's silence may indicate only an intent not to alter whatever message the creditor had most recently communicated to the debtor.  And where that message was a demand for immediate payment, silence may indicate only that the prior demand has not been withdrawn.

Thus, as the relevant precedents amply demonstrate, determining whether the record in a given case includes "sufficient indicia of agreement" to support the inference that a creditor agreed to defer payment will often require a particularized review of both the creditor's conduct and the surrounding context.  Here, our review of the record leads us to the conclusion that Madarati never agreed -- tacitly or expressly -- to defer Loukas's payment.

## c.

The government's brief is less than clear in identifying the evidence in the record that suffices to show that Madarati agreed to defer the payment of what Loukas owed.  But at oral argument, the government explained that it "doesn't contend that the deferral occurred at the time Loukas took off to California with the money."  The government contended instead that the

- 19 -

agreement to defer "repayment or satisfaction" occurred later, when Loukas returned from California.

At that point, the government contends, Loukas did owe Madarati either the pills that Loukas was to buy with Madarati's money or the money itself. And, in the government's view, when Madarati made contact with Loukas following his return to Boston but then waited more than a week before undertaking extortionate means to collect payment, Madarati tacitly agreed to defer payment by Loukas.[8]

In pressing this contention, the government identifies certain specific actions that Madarati took (or, in some cases, failed to take) that allegedly show that he was tacitly agreeing to give Loukas more time to pay. But, we conclude, the record does not supply sufficient evidence of such a tacit agreement on Madarati's part.

---

[8] In his opening brief, Martinez argued that there was no "debt" at all, because Loukas was merely Madarati's agent. But Martinez does not explain why a jury could not reasonably find that Loukas became Madarati's debtor, at the latest, upon Loukas's return from California when he failed to provide Madarati with either the pills or the money, and we see no basis for concluding that a jury could not so find. See United States v. Bonanno, 467 F.2d 14, 15-17 (9th Cir. 1972) (finding a debt on similar facts). Martinez also argues that Loukas's decision to steal Madarati's money "did not create an extension of credit," because it was "simply a theft." But the key issue is whether Madarati agreed to give Martinez more time to pay, and the reason for Loukas's default -- namely, whether he stole the pills -- has no bearing on that issue.

To see why, it first helps to describe what the record shows about what had transpired before Madarati met with Loukas when Loukas came back to Boston from his trip to California. Loukas testified that on March 29, 2011, as he was on his way to the airport in Los Angeles at the end of his second solo trip to California on Madarati's behalf, he called Madarati. In that call, Loukas testified, he told Madarati that the police had pulled Loukas over while Loukas was heading to the airport and confiscated all the pills that Loukas had just purchased with Madarati's money.

In truth, however, according to Loukas's testimony, Loukas had purchased the pills for Madarati as requested but then given the pills to a friend who sold the pills on his own and split the profit with Loukas. In other words, Loukas testified, the police had not confiscated the pills. Instead, Loukas stole the pills from Madarati and then came up with a cover story to tell Madarati in order to hide his theft.

There is no evidence in the record about how Madarati responded to Loukas's false story when he first heard it. But Loukas conceded in his testimony that the story he told Madarati was an "outrageous" one that no one would likely believe. And thus it is not surprising that the record shows that when Loukas arrived in Boston, he "basically disappeared for a day," such that Madarati "had no idea where I was."

In light of what the record shows regarding these events, a rational jury could not find that Madarati assented -- even tacitly -- to give Loukas more time to provide the pills or the money as of the first day after Loukas had returned to Boston. The record shows only that, as of that time, Loukas had told Madarati an "outrageous" lie to explain why he did not have the pills or the money and that Loukas then effectively hid from Madarati upon returning to Boston.

Nor does the record provide sufficient evidence from which a jury could reasonably find that Madarati assented to the deferral of Loukas's payment thereafter. To explain why we reach this conclusion, we begin with what the record shows about the first contact that Loukas made with Madarati after Loukas came back to Boston.

Loukas testified that "about a day" after he got back from Los Angeles, Loukas turned his phone back on, called Madarati, and "told him to meet me at my home." According to the testimony given by Loukas, he and Madarati talked for about an hour when they met on March 30. At that meeting, according to Loukas's testimony, Loukas repeated the same false story that he had relayed to Madarati over the phone from California. Then, Loukas testified, at Madarati's suggestion the two men left Loukas's house in Madarati's wife's car and drove to a convenience store.

- 22 -

Loukas testified that during that ride, Madarati made no threats to Loukas and that "[a]t that moment I thought he was buying the story." But, Loukas's testimony reveals, Madarati quickly changed his tone once the two men arrived at the convenience store. Loukas testified that when the two men got to the parking lot of the convenience store, "[Madarati] proceeded to let me know that he hoped it wasn't me [who took the pills] because he would take care of the problem like he did at the jewelry store," referring to the jewelry-store shooting incident that resulted in injuries to innocent bystanders (and provided the basis for Count 2 of the indictment in this case).

Neither completely excusing a debt or claim, nor threatening violence if no payment is made, can fairly be characterized by itself as assenting to the deferral of the payment of what is owed. And thus, on these facts, it would be "overly speculative" for a jury to conclude that, in making clear the dire consequences that would befall Loukas if he was lying about what had happened to the pills, Madarati was actually agreeing to give Loukas more time to pay the debt. See Wallace, 59 F.3d at 339 ("[N]one of the evidence presented at trial amounted to the formation of a credit agreement, because Wallace and his representatives never agreed to defer the collection of their money. After making their threats, they merely (and temporarily) left Capri intact." (alterations and internal quotation marks

omitted)); <u>United States</u> v. <u>Morillo</u>, 158 F.3d 18, 22-23 (1st Cir. 1998) ("We must conduct a close review of the record and 'reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'" (citation omitted)).

That leaves only the time period between the parking-lot conversation and the actual use of extortionate means. But the record does not show that Madarati did anything during that time period that would provide sufficient evidence for a jury to find that Madarati was agreeing (even tacitly) to give Loukas more time to pay.

The record shows that on March 31, the day after the two men spoke in the convenience store parking lot, Madarati called Loukas and repeatedly demanded his "shit," even telling Loukas he would "see [him] today." Moreover, in the only other conversation between the two men reflected in the record, Madarati spoke to Loukas in Loukas's driveway and made clear to Loukas that Madarati "wanted his money or he wanted the pills."[9] Thus, Madarati did not in these interactions in any way suggest that Loukas had more time to pay.

---

[9] The record is not clear on exactly when that conversation took place, but Loukas's testimony appears to indicate that it occurred shortly after the March 31 phone conversation.

In arguing that Madarati nevertheless tacitly agreed to defer the payment following the parking-lot conversation, the government cites to a series of conversations between Madarati and the third man charged in the conspiracy, Kabba, between April 1 and April 9. In those conversations, the two men discussed ways to intimidate Loukas and to induce him to pay. The government notes in particular an April 1 call between Kabba and Madarati during which Madarati expressly chose not to go through with a plan to frame Loukas by planting cocaine in his house and calling the police. And the government contended at oral argument that the delay between that call and the ultimate execution by Madarati and Kabba of another version of their plan -- which led to Martinez's arrest near Loukas's house on April 10 -- provides a sufficient evidentiary basis for a jury to find that Madarati tacitly agreed to a deferral given the time that passed before Madarati resorted to the use of extortionate means.

But the record evidence concerning Madarati's conversations with Kabba between April 1 and April 9 is not sufficient to support a finding beyond a reasonable doubt that Madarati was, despite his demands for immediate payment, actually agreeing to allow Loukas to take more time to pay. In plotting how best to effect the collection of what he was owed and what he had demanded be paid, Madarati did not at any point withdraw his earlier, clearly stated demand for immediate payment, which

- 25 -

followed right on the heels of the parking-lot threat.  Indeed, during each conversation between Madarati and Loukas in the period in question, Madarati demanded immediate payment from Loukas.

To be sure, as the government emphasizes, Madarati did delay the use of extortionate means to collect payment for a number of days.  But it is the use of extortionate means to collect "an extension of credit" -- and not their use to collect a debt -- that the statute prohibits.  See Boulahanis, 677 F.2d at 590.  And thus evidence of a delay in using extortionate means to collect a debt for which a demand for immediate payment has been made does not itself suffice to show that credit has been extended.  See Wallace, 59 F.3d at 339.[10]

For these reasons, this case is not just like Hoyle, 237 F.3d at 6, even though the government, like the District Court, relies on that precedent to support the conviction.  In that case, an electrician had provided electrical contracting services to multiple customers without a written contract and without then demanding "immediate payment."  Id.  Some months later, the indictment charged, the electrician used extortionate means to collect on the services.  Id.

_____

[10] We note that the government, in its opening statement and closing argument below, consistently characterized Martinez as a "debt collector" or a "debt collection subcontractor" and as having "enter[ed] a conspiracy to collect a debt by use of extortionate means."  At no point in the trial did it argue to the jury that Madarati agreed to defer repayment of Loukas's debt to him.

In sustaining a conviction under § 894 against a sufficiency-of-the-evidence challenge, we held that on the record in that case it was "logical to infer, at the very least, that there was a tacit agreement to defer repayment of the debt" there at issue. Id. And in explaining that "[o]nce the services were provided and immediate payment was not demanded, an extension of credit was established," we noted that it would have been unreasonable for the beneficiaries of the services to have assumed that the services were provided at no cost or that a bill would not be forthcoming in "due course." Id.

But while in Hoyle the agreement to defer payment could be "logical[ly]" inferred from the electrician's silence upon providing the services, id., no similar logical inference can be drawn from Madarati's actions (or inaction). The electrician chose not to present a bill within any expected time frame. Id. Madarati, by contrast, was not silent upon Loukas's return to Boston. Instead, Madarati threatened him during their first meeting and then made two explicit demands for payment in the only two conversations that the record shows they had thereafter. And while Madarati took a little more than a week to make good on his threat, he did nothing in between that could reasonably be understood as a withdrawal of the threat-backed demand for payment he had just made.

The District Court did also note that this case was "arguably" similar to Hoyle for the separate reason that "it would have been unreasonable for Loukas to assume that Madarati was paying him (and providing resources) for services that would not be performed." On that reasoning, the deferral of payment occurred at the very outset of the transaction, when Madarati first gave his money to Loukas, as Madarati would receive the pills (or the money he had handed over) only later.

But, as we have explained, the government affirmatively represented at oral argument that it was not contending that "the deferral occurred at the time that Loukas took off to California with the money," and the government instead has urged us to find an extension of credit on the basis of the evidence of Madarati's words and actions in the time period after Loukas returned to Boston. Consistent with the government's view of when any "deferral" could have occurred, the record shows that, in providing the money to Loukas to buy pills on his behalf, Madarati was providing the funds necessary for Loukas to carry out a task which gave rise to a debt. The record provides insufficient evidence that Madarati was at that time assenting to the deferral of its repayment. Thus, on these facts, we agree with the government's concession that there was no assent by Madarati to defer a deadline for re-payment -- and thus no "extension of credit" -- prior to Loukas's return from California.

**D.**

Congress has made clear that § 894 is to be construed broadly. H.R. Rep. No. 1397, at 31 (1968) (Conf. Rep.) ("[T]he conferees wish to leave no doubt of the congressional intention that chapter 42 is a weapon to be used with vigor and imagination against every activity of organized crime that falls within its terms."). And an agreement to defer payment need not be express or even bilateral. See Hoyle, 237 F.3d at 6 (citing Sedlak, 720 F.2d at 720). Thus, on some facts, a creditor's delay in collecting a prior demand for payment might suffice to show an agreement to defer payment. But, consistent with Hoyle and the plain text of § 891(a), the record in each instance must show "sufficient indicia of agreement . . . to conclude that an agreement to defer payment of the debts existed" in order for there to be sufficient evidence to sustain that element of the crime. See Hoyle, 237 F.3d at 7. And here, the record reveals only that Madarati threatened harm to Loukas if he failed to pay what he owed and then quickly followed up that threat by twice demanding immediate payment while he finalized his preferred method of using extortionate means to collect on the debt. We therefore cannot conclude that the record supplies sufficient indicia that Madarati agreed to defer payment at any point, and thus we must reverse

Martinez's conviction as to Count 3 due to a lack of sufficient evidence of any underlying "extension of credit."[11]

## IV.

For the reasons set forth above, we **reverse** the conviction of Ronald Martinez as to Count 3 and **affirm** in all other respects.

---

[11] The remaining published precedents on which the government relies do not provide support for finding sufficient evidence of an extension of credit on the record in this case. In United States v. Garcia, 135 F.3d 951, 954 (5th Cir. 1998), the creditors "manifest[ed] an assent to defer payment" by permitting the debtor to pay for a portion of his purchase (of marijuana) and "allow[ing] him to pay for the balance at a later date," which was consistent with a prior course of dealing. There is no similar evidence in the record here. In Bonanno, 467 F.2d at 15, the creditor demanded that "at least $2,500" of a $5,000 debt "had to be repaid immediately" and allowed the debtor additional time to pay the balance. Here, there was no such express agreement. In United States v. Charles, No. 92-3513, 1993 WL 299361, at *3 (7th Cir. Aug. 3, 1993) (unpublished), the defendant challenged the sufficiency of the evidence but not specifically whether the government had proved an "extension of credit." And in United States v. Neal, 692 F.2d 1296, 1301-03, 1308 (10th Cir. 1982), the defendant raised a number of challenges relating to the sufficiency of both the indictment and the trial evidence, but the court did not specifically address the evidence sufficient to prove an "extension of credit." The government does also cite to an unpublished case from the Tenth Circuit, United States v. Enriquez, No. 96-6185, 1997 WL 31567, at *2 (10th Cir. Jan. 28, 1997) (unpublished), which upheld a conviction because the "defendant several times set deadlines for payment which he later postponed." But that opinion does not describe what evidence was in the record that led it to conclude that "deadlines" had been "postponed."