# United States Court of Appeals
## For the First Circuit

No. 16-1469

UNITED STATES OF AMERICA,

Appellee,

v.

JAMES P. DIDONNA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Howard, Chief Judge,
Selya, Circuit Judge,
and McConnell, District Judge.*

Judith H. Mizner, Assistant Federal Public Defender, with whom Federal Defender Office was on brief, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom William D. Weinreb, Acting United States Attorney, was on brief, for appellee.

August 2, 2017

---

*Of the District of Rhode Island, sitting by designation.

**SELYA**, **Circuit Judge**.  In this case, the jury convicted defendant-appellant James P. DiDonna of attempted Hobbs Act extortion, see 18 U.S.C. § 1951(a), and attempting to collect an extension of credit by extortionate means, see id. § 894(a).  On appeal, the defendant challenges the sufficiency of the evidence across the board.  After careful consideration, we conclude that the evidence is sufficient to sustain the defendant's conviction on the extortion charge.  "Extension of credit," though, is a term of art, and when that term is properly understood, the evidence is insufficient to sustain the defendant's conviction on the remaining charge.  Accordingly, we affirm in part and reverse in part.

## I.  BACKGROUND

"We rehearse the facts in the light most hospitable to the verdict, consistent with record support."  United States v. Maldonado-García, 446 F.3d 227, 229 (1st Cir. 2006).  In the process, we draw all reasonable inferences in favor of the verdict.  See id. at 231.

Raymond Buck (Buck) and his wife, Linda, own Archer Angus, a cattle farm in Chesterville, Maine.  They raise and sell grass-fed Maine beef.  In 2009, the defendant approached the Bucks and offered his services as a sales representative.  The Bucks initially declined his offer but, a year later, they reversed course and joined forces with the defendant.

The arrangement was never reduced to writing. Yet, its main points — with one notable exception — are undisputed. The defendant toiled as an independent contractor, marketing Archer Angus beef primarily to restaurants. The Bucks paid him a ten percent commission on restaurant sales and a five percent commission on all other sales. The record is tenebrous, though, as to whether the defendant was entitled, upon termination of the relationship, to commissions for future sales on accounts that he had originated. The defendant says that he was; the Bucks say that he was not.

Once affiliated with Archer Angus, the defendant sold the farm's beef to some of Boston's best-known restaurants. He also developed a relationship with a premium grocer. Despite these added sales, Archer Angus struggled: the farm had cash-flow problems, exacerbated by the fact that some of its new customers did not pay on time. Paradoxically, Archer Angus sometimes had to scramble to fill existing orders. To smooth out this wrinkle, Archer Angus (heedless of its boast that its cattle were grass-fed and locally raised) began purchasing some beef from a farm in Pennsylvania (a farm that, for aught that appears, gave Archer Angus no assurances about the cows' diet).

By the summer of 2012, Buck's disappointment with Archer Angus's sales trends reached critical mass. Around the same time, Buck was experiencing difficulty in contacting the defendant. On

July 17, 2012, Buck sent the defendant an e-mail, unilaterally terminating the relationship. The defendant did not reply for almost five months. When he did respond — in a December 6, 2012 e-mail — he demanded his unpaid commissions. After Buck transmitted an initial accounting, the defendant sought recompense in January of 2013 for specific sales that he claimed had been omitted from the accounting. He made no mention of remuneration for any sales occurring after July.

Buck agreed with the defendant's proposed adjustments and submitted a revised payout figure ($16,713.06). That sum was significant in terms of Archer Angus's cash flow, and the Bucks had to borrow the money. When the funds were secured, they put them in escrow with their attorney, Thomas Peters, and notified the defendant. Once again, the defendant did not respond.

In May of 2013, Peters wrote to the defendant, reminding him that he still had the money in escrow. On June 14, the defendant telephoned Peters and said that he wanted more money. He added that if his demand was not satisfied, he would either embarrass Archer Angus or put the farm out of business altogether. Peters — who viewed himself mainly as an escrow agent — referred the defendant to Buck. Peters thereafter informed Buck about the defendant's statements.

Roughly a month later, the defendant called Peters again. In that call (which took place on July 23), the defendant

advised Peters that he had not heard from Buck and that he continued to expect remuneration for his silence.

On August 13, the defendant and Buck finally spoke. Buck recorded the call. After exchanging brief pleasantries, the defendant explained what lay behind his demand for more money: "I've come across information in detail that if exposed would be disastrous for the future of your business." The defendant warned: "[T]he information that I have [] is basically information that will be exposed[.] I have information, attorneys lined up in multiple states. I have boards. I have agencies. I have commissions. . . . In addition to [] probably [ninety] percent of your clients that will know about this, in addition to media outlets." He then asserted that Buck was "misrepresenting what [he was] selling" — an apparent reference to the fact that not all Archer Angus beef was from Maine and that the animals' diet was unknown. The defendant refused to quantify his demand for more money, instead pressing Buck to make him an offer. Some representative statements follow:

- "I'm looking for you to look at the big picture of this and what this is really worth to you."

- "[Y]ou need to ask what the future of your business is worth to you, because it will all be gone. And whatever . . . you misrepresented to your clients, . . . you're gonna be on the hook for it."

- "I'm looking to you to sit down, take a step back, it's not a time to be emotional, or

- 5 -

> stubborn, or defensive.  It's not a time to
> procrastinate and it's certainly not a time to
> be cheap."

The defendant told Buck that he was "giving [him] one week" to propose a settlement amount.  When Buck stated that he expected the defendant to name a figure, the defendant demurred, saying "[Y]ou're gonna risk being exposed in a week!  It's that simple.  And if you wanna roll the dice on that, if you wanna call my bluff, knock yourself out, cause everything you have is gonna be gone."  At that juncture, Buck accused the defendant of blackmail.  The defendant retorted, saying "This is not blackmail, because it's the truth and you know it's the truth."

During this call, the defendant also asked that Buck turn over "the money that we agreed to in January" within a week (an apparent reference to the sum held in escrow, which the protagonists already had agreed was due to the defendant for pre-termination commissions).  He also claimed, without elaboration, that additional compensation was due to him in the wake of the terminated relationship.  Buck countered that Archer Angus's records showed that the defendant was not owed any commissions beyond the previously agreed amount.  The defendant rejoined, cautioning that Buck was risking "being exposed."

The August 13 call led Buck and Peters to contact the Federal Bureau of Investigation (FBI).  Following a plan developed as a result of that contact, Peters reached out to the defendant

by e-mail on August 21, with an eye toward setting up another telephone call. In that e-mail, Peters noted that he saw "the wages issue" and "the other issue" as "two separate issues." The defendant did not disavow this characterization: in an August 22 e-mail, he demanded payment of the previously agreed amount, together with some further "settlement offer made by your client." He set a deadline of August 27 for both the agreed-upon payment and the further offer. He went on to add that "I have identified thousands and thousands of dollars that I have not been paid on (that can be proven) and which is not included in the current amount that you have in escrow."

On September 3, Peters called the defendant. Buck was present but did not speak. During this call (which was recorded), Peters again summarized the defendant's claims as raising "two issues": the "back money" owed to the defendant for unpaid pre-termination commissions and a payment in an as-yet-unspecified amount. In contrast to the payment for past commissions (which would be made by check), Peters suggested that the second issue be settled by means of a cash payment, without any concomitant paperwork. The defendant expressed some reluctance to accept cash with no documentation, but Peters, citing the transaction's "probabl[e] illegal[ity]," did not budge.

Two weeks later, Peters, Buck, and the defendant took part in another call designed to complete their negotiations. In

this call (which also was recorded), the defendant characterized

his demand for more money as a "business development settlement."

The parties eventually agreed to a $40,000 cash payment.  The

following colloquy ensued:

> Buck: I have to get this money[,] Jim.  How
> long are you gonna give me to raise it[?]
>
> Defendant: You want to . . . do it in
> installments, . . . I'm fine with that.
>
> Buck: No, we'll settle out the whole thing and
> you'll get your money and go away.  I'm tired
> of friggin with you.

After a brief discussion as to the place and manner of delivery,

the protagonists returned to the question of timing:

> Buck: So when?
>
> Defendant: Is it . . . next week[?]
>
> Buck: Need a day and time.  I've gotta have it
> here.
>
> Defendant: Now that's uh, how does [Peters's]
> schedule look?
>
> Peters: I don't need to be involved. . . .  As
> long as [Buck's] got enough time to get it
> together, it doesn't matter to me.
>
> Buck: Week from today sound good to you?  Same
> time, same place?
>
> Defendant: [L]et's do Wednesday.
>
> Peters: What's the date? . . .
>
> Defendant:  [I]s it the 25th?
>
> Peters: [L]et me look.  Next Wednesday[.]

Defendant: 25th. Wednesday the 25th.

At the conclusion of this September 17 call, the participants agreed that Buck would leave the additional money at Peters's office in Lewiston, Maine for pickup.

The date and place of the pickup were subsequently changed, apparently at the instance of the FBI. Although the record is murky on this point, it seems that the FBI made an "operational decision" so that it could "better control" the transaction and satisfy its specialized planning requirements. The net result was that the pickup was rescheduled to take place at a rest stop on the Massachusetts Turnpike on October 3, 2013.

On October 3, an undercover FBI agent, posing as a courier, met the defendant at the rest stop. The defendant was accompanied by Joseph Parmakian, a retired law enforcement officer. The agent turned over an envelope, supposedly containing the cash but actually containing scrap paper. The defendant took the envelope, and he and Parmakian left the rest stop.

In due season, a federal grand jury sitting in the District of Massachusetts charged the defendant, in a superseding indictment, with one count of attempted extortion in violation of 18 U.S.C. § 1951(a) (count one) and one count of use of extortionate means to collect and attempt to collect an extension of credit in violation of 18 U.S.C. § 894(a) (count two). A five-day jury trial eventually ensued. At the close of all the

evidence, the defendant moved for judgment of acquittal.  See Fed.
R. Crim. P. 29.   The district court denied the motion, and the
jury convicted the defendant on both counts.   The court sentenced
the defendant to concurrent incarcerative terms of one year and
one day, plus two years of supervised release.   This timely appeal
followed.

## II.  ANALYSIS

The defendant challenges the sufficiency of the evidence
regarding both counts of conviction.   "[W]e review the denial of
his motion for judgment of acquittal de novo."  See United States
v. George, 841 F.3d 55, 61 (1st Cir. 2016).   In that endeavor, we
ask "whether, after assaying all the evidence in the light most
amiable to the government, and taking all reasonable inferences in
its favor, a rational factfinder could find, beyond a reasonable
doubt, that the prosecution successfully proved the essential
elements of the crime."  United States v. Chiaradio, 684 F.3d 265,
281 (1st Cir. 2012) (quoting United States v. O'Brien, 14 F.3d
703, 706 (1st Cir. 1994)).

Here, the counts of conviction, though related, pose
different sufficiency questions.   Consequently, we consider them
separately.

### A.  Hobbs Act Extortion.

We start with the defendant's conviction on count one.
This count charges a violation of 18 U.S.C. § 1951(a), which

forbids "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempt[ing] or conspir[ing] so to do." Extortion, in turn, is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Id. § 1951(b)(2). Such a crime is commonly known as Hobbs Act extortion.

In this case, the government charges that the defendant attempted to extort money through the wrongful use of fear. "Under the Hobbs Act, 'fear' encompasses fear of economic loss, including the loss of business opportunities." United States v. Cruz-Arroyo, 461 F.3d 69, 74 (1st Cir. 2006). The pivotal question, then, is whether the evidence is sufficient to prove that the defendant wrongfully employed threats of economic ruin.[1]

To prove fear of economic loss, "the government must show that the victim reasonably feared that noncompliance with the putative extortionist's terms would result in economic loss." Id. We think that the government has carried this burden. For his part, Buck reasonably feared the potential for economic loss. The substance of the defendant's statements to Buck — both those made directly to Buck and those made to Peters on the understanding

---

[1] The defendant does not challenge the sufficiency of the government's proof as to the other elements of Hobbs Act extortion.

that they would be shared with Buck — is essentially undisputed. The defendant repeatedly threatened Buck and Buck's business (Archer Angus) with economic harm in an effort to obtain money from Buck (and, by extension, from Archer Angus). The record is strewn with such threats. To select but a few examples:

- The defendant told Peters, on the understanding that Peters would relay the comment to Buck, that he would put Archer Angus out of business if he was not paid more money.

- The defendant told Buck directly that he had "information in detail that if exposed would be disastrous for [Buck's] business."

- The defendant warned Buck that "if you wanna call my bluff, knock yourself out, cause everything you have is gonna be gone."

Manifestly, Buck interpreted these statements (reasonably, we think) as a threat to wreck his business. The law is clear that a person may not use threats of economic harm to obtain money or property to which he has no claim of right. See United States v. Sturm, 870 F.2d 769, 773 (1st Cir. 1989); United States v. Kattar, 840 F.2d 118, 124 (1st Cir. 1988). The sufficiency of the evidence of Hobbs Act extortion thus turns on whether the defendant had a claim of right to the additional money that he was attempting to garner.

We caution, though, that whether the defendant's claim of right is legally correct is not the determinative factor. See Sturm, 870 F.2d at 774. Rather, the government must prove, by direct or circumstantial evidence, that the defendant "knew that he was not legally entitled to the property that he [either] received" or attempted to receive. Id.

The defendant argues that he believed that he was owed the $40,000 payment in settlement of legitimate claims and that his threats were simply a species of "hard bargaining." The government argues that the defendant's demand had nothing to do with the settlement of claims for sums owed in consequence of the terminated business relationship. Instead, the government regards the defendant's statements as an attempt to extort Buck by demanding hush money in exchange for silence about information that could have damaged the Bucks' business. If the government's assessment of the defendant's statements is correct, then the defendant had no claim of right: he could not reasonably have thought that he had a right to any additional money.

The relative persuasiveness of these competing arguments depends on which inferences a factfinder chooses to draw from the raw facts. In our view, the evidence was sufficient for a rational jury, drawing reasonable inferences in the government's favor, to find beyond a reasonable doubt that the defendant knew that he had no claim of right to the money demanded. We explain briefly.

- 13 -

To begin, the defendant made clear, in the earlier conversations, that the price for his silence was an additional payment. He also made clear the dire consequences that would ensue if Buck turned him away empty-handed. The jury was entitled to give the defendant's words their ordinary meaning and to treat his demand for an additional payment, coupled with his threats of economic harm, as extortion. See United States v. Cruzado-Laureano, 404 F.3d 470, 482 (1st Cir. 2005).

The defendant would have us read the record differently. He says that despite his bluster, his real intent was to secure additional compensation that he was owed (that is, commissions on post-termination sales to customers whom he had brought to Archer Angus). This view of the situation has some support in the record. It cannot be gainsaid that, during the various conversations, the defendant made some remarks that a jury could find consistent with his claim that he was merely seeking unpaid post-termination commissions. For example, the defendant told Buck at one point that he could prove that Archer Angus owed him "additional thousands and thousands of dollars." At another point, the defendant characterized what he was seeking as a "business development settlement."

These allusions, though, were never accompanied by any detail as to what actual post-termination commissions the defendant believed that he was owed. And when Buck pressed the

- 14 -

defendant to identify those commissions, the defendant retreated to his threat of "expos[ing]" Buck and Archer Angus.

In all events, what was not said seems to buttress the government's version of what was transpiring. The defendant never asked Buck either for a specific sum or for compensation for particular accounts. Instead, the defendant insisted, over and over again, that Buck decide how much the defendant's silence was "worth to [him]." If the defendant thought that he had been unfairly deprived of certain commissions, the ordinary course would have been to ask for an accounting of profits with respect to particular customers (as the defendant did in January of 2013, when Buck first sought to pay him his accrued pre-termination commissions).

The defendant's conduct during the negotiation process also gives rise to reasonable inferences that support the jury's verdict. For one thing, when Buck pointedly accused the defendant of blackmail, the defendant did not claim that he was owed the money for services rendered but, rather, retorted that "it's the truth" — an apparent reference to the accuracy of the compromising information that the defendant had threatened to air. For another thing, when Peters distinguished between "the wages issue" and "the other issue," the defendant never protested that there was only a single issue — the amount of earned compensation due to him. And, finally, when Buck challenged the defendant to identify

any particular commission that had not been accounted for, the defendant deflected the question by reiterating his admonition that he would "expose[]" Buck. Jurors are fully within their rights to make commonsense inferences, see O'Brien, 14 F.3d at 708, and it is a commonsense inference that if the defendant was actually seeking compensation for money legitimately owed, he would have mentioned at some point either the amount he was owed or the manner in which it could be computed.

Last — but not least — the jury was not bound to credit the defendant's isolated statements regarding money owed to him. See United States v. Jimenez-Perez, 869 F.2d 9, 12 (1st Cir. 1989) (deeming it "apodictic that a trier of fact is not bound to accept the self-serving stories of persons accused"). Rather, it could have regarded those statements as self-serving attempts to gild his criminal act with a specious veneer of legitimacy.

In the last analysis, it was for the jury to say, on this mottled record, whether the defendant was seeking a payment for his silence (as the government contends) or a payment for his services (as the defendant contends). See United States v. Olbres, 61 F.3d 967, 973 (1st Cir. 1995) (explaining that a jury is free to choose among alternative interpretations of the evidence, so long as the jury's choice is reasonable). After all, it is the jury's responsibility to weigh the evidence in its totality, resolve contradictions in the facts, and gauge the credibility of

the witnesses.  See O'Brien, 14 F.3d at 707.  That is precisely what the jury did in this case.

We conclude, without serious question, that a rational jury could have found beyond a reasonable doubt — as this jury did — that the defendant's demands were not for unpaid post-termination commissions but for hush money.  So, too, we conclude that a rational jury could have found beyond a reasonable doubt — as this jury did — that the defendant wrongfully employed extortionate threats of economic harm to ensure that his demands for money to which he had no claim of right were satisfied.  No more is exigible to defenestrate the defendant's challenge to his Hobbs Act conviction.  As we have said, a "court of appeals ought not disturb, on the ground of insufficient evidence, a jury verdict that is supported by a plausible rendition of the record."  United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992).

## B.  **Extension of Credit**.

The defendant also challenges, on sufficiency grounds, his conviction on count two.  That count charged him with violating 18 U.S.C. § 894(a), which criminalizes, as relevant here, the "use of any extortionate means" in the collection or attempted collection of "any extension of credit."  In the defendant's view, the evidence is insufficient to show either that he used extortionate means or that he made any extension of credit.

Because we agree that the evidence does not show that the defendant made an extension of credit, we start — and stop — there.

Section 894(a) "has a broad reach." United States v. Dzhanikyan, 808 F.3d 97, 105 (1st Cir. 2015). That reach is not limited to conventional loans. See id. Rather, the statute encompasses any "extension of credit," defined as "any loan [or] agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred." 18 U.S.C. § 891(1).

The key to the existence of an extension of credit is the creditor's agreement to defer payment. See United States v. Hoyle, 237 F.3d 1, 7 (1st Cir. 2001). In the absence of a conventional loan, "the government must prove that the creditor manifested an assent (even if only unilaterally and even if only tacitly) to defer payment." Dzhanikyan, 808 F.3d at 106.

Here, the government says that the defendant extended credit to Buck in no fewer than three instances. First, during the August 13 telephone call, the defendant told Buck that he was "giving [Buck] one week" to make him an offer in order to secure his silence and one week to pay him "the money . . . agreed to in January." Second, in his August 22 e-mail to Peters, the defendant issued essentially the same two-part ultimatum, this time with a deadline of August 27. Third, in their September 17 telephone

- 18 -

call — after the "settlement amount" had been negotiated — the defendant and Buck agreed that the funds ($40,000) would be delivered eight days later.

The government's first theory need not detain us. This theory is premised on statements made in the August 13 conversation and the August 22 e-mail. The theory is amplified in the government's appellate brief, which suggests that the phrasing of the defendant's demands for the pre-termination commissions admittedly due ($16,713.06) supports a finding that credit was extended. But there is a rub: the government did not advance this theory below. The indictment charged the defendant, in pertinent part, with knowing participation "in the use of extortionate means . . . to collect and attempt to collect an extension of credit from [Buck], d/b/a [Archer Angus], to include $40,000.00 in U.S. currency, and to punish [Buck] . . . for the nonrepayment thereof." The government's arguments at trial tracked this theory of the case: in both its opening statement and its summation, the prosecution trained its fire exclusively on the defendant's demands for a settlement offer and the ensuing arrangement for payment of the settlement amount ($40,000). Consonant with the language of the indictment and the government's professed theory of the case, the district court's jury instructions with respect to count two mentioned only the $40,000 settlement.

In dealing with criminal defendants, the government must turn square corners. It cannot use bait-and-switch tactics, relying on one theory of the case in the indictment and during the trial and then — after obtaining a favorable verdict — relying on an entirely different theory to uphold the verdict. See Dunn v. United States, 442 U.S. 100, 106 (1979). So, too, a reviewing court cannot affirm a criminal conviction on the basis of a theory that was never advanced in the trial court. See Chiarella v. United States, 445 U.S. 222, 236 (1980); see also United States v. Boulahanis, 677 F.2d 586, 591 (7th Cir. 1982) (rejecting theory of extension of credit that was "different" from "theory of the extension of credit that the government actually pressed [at trial]").

The government's second theory fails for a different reason. That theory focuses on the defendant's demands that Buck produce a settlement offer by certain deadlines. Although this theory was actually argued to the jury, we think it is evident that no rational jury could have found beyond a reasonable doubt that those demands constituted extensions of credit. After all, an agreement to defer repayment necessarily implies that if the debtor were both willing and able, payment could have been made prior to the deferral. See Hoyle, 237 F.3d at 2, 6. Otherwise, there would be nothing to defer. Cf. United States v. Stokes, 944 F.2d 211, 215 (5th Cir. 1991) (holding that contract did not create

extension of credit when "[n]o payment was [yet] due" under contract). That is the fatal flaw in the government's theory. The very nature of the defendant's demands for a settlement offer makes pellucid that there could be no extension of credit: the amount of the debt was undetermined and thus impossible either for Buck to satisfy or for the defendant to defer.

This leaves the September 17 telephone call. Considering that call in context, we do not think that the defendant's statements and conduct, even when taken in the light most favorable to the government, are sufficient to establish an extension of credit.

Prior to September 17, the parties had not agreed about whether Buck would make any payment beyond the $16,713.06 admittedly due for unpaid pre-termination commissions. In the September 17 call, Buck and the defendant agreed to an additional settlement of $40,000. The defendant expressed a willingness to let Buck pay the settlement amount in installments, but Buck declined. Instead, he focused on when the cash should be delivered and suggested a "[w]eek from today." The defendant proposed September 25 (one day later) as more convenient, and the parties agreed to that date. The government argues that the eight-day

delay between the demand for the $40,000 and the September 25 delivery date constitutes an extension of credit.[2]

A delay between demand and payment, without more, does not constitute an extension of credit. In United States v. Wallace, the Second Circuit held that even when a defendant "tolerated a delay in payment" but did so without agreeing to defer payment, such "impatient forbearance was no more than a reprieve on his extortionate threats" and did not violate section 894(a). 59 F.3d 333, 340 (2d Cir. 1995). So it is here: although the defendant agreed to a payment date that was eight days in the future, the evidence simply does not support a reasonable inference that he agreed to defer the debt. In this case, as in Wallace, the delay was nothing more than a reprieve with respect to the defendant's extortionate threats.

All of the raw facts point in this direction. Until September 17, there was no settlement and no agreed amount. The record makes luminously clear that, on September 17, the parties were negotiating all the terms of the nascent settlement (including the date for its consummation). When a meeting of the minds finally occurred, Peters insisted that the settlement amount be paid in cash. Since the parties were located in different states

_____

[2] While the delivery date was later changed to October 3, that change was at the instance of the FBI. The government has not argued that, on its theory of the case, the defendant can be held responsible for any extension of credit beyond September 25.

and the payment was to be made in cash, it was impossible to complete the transaction at the time of the call. Instead, it was necessary to schedule a mutually convenient time to wrap up the matter. That is exactly what transpired — no more and no less.

As we have indicated, the touchstone of a section 894(a) prosecution is whether there was an agreement to defer the payment of a debt. See Dzhanikyan, 808 F.3d at 106; Hoyle, 237 F.3d at 7. The existence vel non of such an agreement is necessarily context-specific. Making such a determination "will often require a particularized review of both the creditor's conduct and the surrounding context." Dzhanikyan, 808 F.3d at 106-07. In this case, the circumstances — the statements of the protagonists, the impossibility of immediate payment, the practical problems incident to transporting cash to another state, the need to determine a mutually convenient time and place for the exchange, and the shortness of the interval between the demand and the delivery — undermine any inference that the defendant agreed to defer payment of the debt.

Seen in context, the only reason for the brief delay was to accommodate the logistics of payment, not to defer Buck's obligation to pay. Mutual convenience dictated the final arrangement. Moreover, the defendant neither said nor did anything

to indicate that he was not "consistently mainfest[ing his] demand for immediate payment."[3]  Stokes, 944 F.2d at 215.

The government's contrary argument depends on an interpretation of section 894 that echoes the interpretation that this court rejected in Dzhanikyan.  There, we debunked the notion that "a mere demand for payment . . . suffices to show that there has been an agreement to defer payment and thus an 'extension of credit.'"  808 F.3d at 106.

Practically speaking, a mere demand for payment is all that the government has shown in the case at hand.  The infirmity of its argument is highlighted by the lack of a limiting principle: any defendant who makes an extortionate demand and receives from the debtor a promise of payment at a specific time, even an hour later or a day later, would be guilty of violating section 894(a).  And this would hold true even where, as here, immediate payment would have been either impossible or impracticable at the time the demand was made.  Such a result would, in effect, reinstate the rule that we rejected in Dzhanikyan.

Our concerns about the sufficiency of the evidence on count two are heightened by two other considerations.  First, the government's theory of guilt blurs the distinction between section

---

[3] Of course, the defendant did at one point raise the possibility of installment payments.  That option, though, was swiftly rejected by Buck, and the protagonists never revisited the subject.

894(a) and Hobbs Act extortion. Section 894(a) criminalizes the collection of an extension of credit by extortionate means. Unlike the Hobbs Act, it does not criminalize mere collection by extortionate means of monies owed. In other words, "[s]ection 894 does not make it a crime to use extortion to collect debts, but only to exact repayment of credit previously extended." Boulahanis, 677 F.2d at 590.

A section 894(a) violation is distinguished from Hobbs Act extortion based on whether there was a true "agreement to defer payment of the debt[]." Hoyle, 237 F.3d at 7. Conflating the two offenses would turn a blind eye to congressional intent and would unfairly augment the government's already extensive armamentarium of potential charges. Cf. Wallace, 59 F.3d at 339 (noting danger of "convert[ing] every common law extortion into a federal loansharking offense" (quoting United States v. Wallace, 856 F. Supp. 843, 847 (S.D.N.Y. 1994))).

Second, the government's theory is at odds with the realities of the marketplace. Say, for example, that X owns a farm in Maine. He wishes to buy a used truck from Y, who operates a dealership in Massachusetts. X takes a particular vehicle back to Maine to test-drive it. He then calls Y, the two negotiate, and they agree on a price, which is to be paid in cash. They then set a time and place for the consummation of the transaction (that is, for X to deliver the cash to Y), based on the practicalities

of the situation and their mutual convenience.  On the government's theory, whatever date they may select would reflect an extension of credit by Y, even though Y consistently manifested his demand for payment.  That may be true in some alternate universe — but it is not true in the real world.

To sum up, the evidence, taken in the light most flattering to the government, is sufficient to show that the defendant attempted to extort $40,000.  But that is all: on this record, a rational jury could not conclude beyond a reasonable doubt that the defendant manifested his assent to defer payment or used extortionate means to "exact repayment of credit previously extended."  Boulahanis, 677 F.2d at 590.  The same conversation that established the debt also set out the payment terms, and the defendant never agreed to defer payment past the date initially set.  It follows inexorably that the defendant's conviction on count two must be reversed.

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, we affirm the defendant's conviction on count one and reverse his conviction on count two.  Because the sentences for the affirmed and reversed convictions were for essentially the same conduct and were to run concurrently, we see no need for resentencing on count one.  See United States v. Abreu, 952 F.2d 1458, 1472 (1st Cir. 1992); cf. United States v. Francois, 715 F.3d 21, 34 (1st Cir.

- 26 -

2013) (remanding for resentencing where the vacated sentence was "central to the district court's calculation of [the defendant's] overall sentencing package").

**Affirmed in part and reversed in part.**